HILDA KEEHN v. D. R. F. REALTY & INVESTMENT COMPANY, Appellant.—43 S. W. (2d) 416.

Court en Banc, November 17, 1931.

1032

*Mark D. Eagleton, John F. Clancy* and *Hensley, Allen & Marsalek* for respondent.

1034

ATWOOD, C. J.—This is an appeal from a personal injury judgment for $15,000 in favor of Hilda Keehn and against D. R. F. Realty & Investment Company, a corporation. The amended petition, upon which the case was tried, alleged that defendants, owned, possessed, controlled and operated a building known as the Francis Building, 1531 Washington Avenue, in the city of St. Louis, in which offices and space for various tenants were rented, and said tenants and their patrons, customers and employees were invited to come into said building; that defendants operated in said building elevators for the transportation of persons from floor to floor as a common carrier of passengers; that on or about June 8, 1926, plaintiff, at defendants' invitation, was a passenger in one of said elevators and while a passenger thereon said elevator dropped, jarred and jolted in an unusual and extraordinary manner and plaintiff was thrown about in said elevator and struck and was struck by parts thereof, all of which directly and proximately resulted from the carelessness and negligence of defendants, and plaintiff was injured thereby. Defendants' answer was a general denial and when the case came on for trial plaintiff dismissed as to all defendants except appellant herein.

Evidence introduced in behalf of plaintiff tended to show that defendant D. R. F. Realty & Investment Company owned and operated the building and elevator in question; that one of its tenants in said building was the Dunlap Millinery Company by which plaintiff was employed; that there were ten floors in the building and plaintiff worked on the ninth floor; that at about 5:30 o'clock in the afternoon of June 8, 1926, plaintiff and some other ladies employed by said millinery company took the elevator at the ninth floor of said building to be carried down to the first floor thereof; that the elevator came down at the usual rate of speed until it reached the fourth floor, and then dropped in a very unusual manner until it struck the bottom with great force and bounced up about two feet and back again to the bottom; that plaintiff was thrown against the back and floor of the car. Appellant does not claim that plaintiff failed to make a case for the jury, so further statement of the evi-

dence will be made only to the extent necessary for a proper consideration of the assignment of errors now urged in this appeal.

Appellant's first point is that instruction numbered one given at the request of plaintiff on the measure of damages "is erroneous because it authorizes a recovery twice for the same injuries and loss." This instruction is as follows:

"1. The court instructs the jury that if under the evidence and the other instructions of the court, you find in favor of the plaintiff, then in assessing her damages you will allow her such sum as you believe and find from the evidence will fairly and reasonably compensate her:

"1st. For such pain and suffering of body and mind, if any, plaintiff has suffered by reason and on account of her injuries, if any, suffered on the occasion in question.

"2nd. For such pain and suffering of body and mind, if any, plaintiff is reasonably certain to suffer in the future by reason and on account of her injuries, if any, suffered on the occasion in question.

"3rd. For such permanent injuries, if any, plaintiff will suffer by reason and on account of the injuries, if any, sustained on the occasion in question.

"4th. For such loss of earnings, if any, you may find from the evidence plaintiff has suffered by reason and on account of said injuries, if any, suffered on the occasion in question, not however, to exceed the sum of $20 per week for such loss of earnings, if any.

"5th. For such future loss of earnings, if any, you find from the evidence plaintiff is reasonably certain to lose in the future by reason and on account of said injuries, if any, suffered on the occasion in question."

It is argued that the third paragraph of said instruction necessarily included paragraphs two and five, and not only authorized, but directed a double assessment of damages for the same injury and loss. The same question was raised in connection with a similar instruction in Coleman v. Rightmyer (Mo. Sup.), 285 S. W. 403, 406, and ruled contrary to appellant's contention. Paragraphs 1 and 2 of the instruction in that case also authorized a recovery for bodily pain and mental anguish, past and future; 4 and 5 for loss of earnings, past and future; and paragraph 3 was as follows:

"For such permanent injuries to plaintiff, if any, which the jury may find from the evidence, were occasioned by his injuries, if any, and directly caused thereby."

In ruling the question we said:

"The instruction in its opening clause reads: 'The court instructs the jury that if you find in favor of the plaintiff you will assess his damages, if any, at such sum as you believe will be fair

compensation to him'—then follow the seven paragraphs indicating the elements of damages to be considered. The dominant thought is that the damages to be assessed should be fair, not double, compensation. It is inconceivable that the jury would understand that if they found the injuries suffered by plaintiff were permanent they should assess double damages for the injuries when the instruction expressly authorized fair compensation. While the form of the instruction is not to be commended, the jury would clearly understand that in awarding damages they were to consider whether the injuries were temporary or permanent, and simply award fair compensation. If counsel for appellant apprehended the jury might take the view now suggested, they should have asked an instruction clarifying this feature.''

Counsel for appellant attempt to distinguish this and the instant case, but we observe no substantial ground of distinction as to the point ruled. Similar holdings appear in Laycock v. Rys. Co., 290 Mo. 344, 357, 235 S. W. 91; Westervelt v. Transit Co., 222 Mo. 325, 338, 343, 121 S. W. 114; Hite v. Railroad Co. (Mo. Sup.), 225 S. W. 916, and Reynolds v. Transit Co., 189 Mo. 408, 420, 88 S. W. 50. We think they control this case.

Appellant's next assignment of error is based upon the following paragraph in the motion for a new trial:

"16. Because the court erred in overruling defendant's objection to unfair argument of plaintiff's counsel in his closing argument where in substance he stated among other things that defendant could have had plaintiff examined by a physician immediately after the injury or at any time immediately after or long before she was finally examined by a physician by agreement of counsel.''

The only portion of the objectionable argument quoted in appellant's brief is as follows:

''MR. EAGLETON: All right. They waited until October, 1927, to get a doctor to make an examination. The time when any other sensible man would have got it was when something would show, especially where you are going to contend it never—

''MR. SCHWARTZ (interrupting): That is unfair argument. Examination must be had by consent or by order of court.

''THE COURT: Proceed with the argument.

''MR. SCHWARTZ: That is unfair and I except to it.

''To which action and ruling of the court defendant, by its counsel, then and there duly excepted and still excepts.

''MR. EAGLETON: Regardless of whether it is by consent or by court order, is it any harder to get consent in September, 1926, than in October, 1927? That is especially true, gentlemen, where you are pointing the finger of suspicion at somebody who brings a suit and

notifies you of it in three weeks of the fact she was hurt there, and tells you how and when and why."

Counsel for appellant insists that this argument constitutes reversible error, citing Bergfeld v. Dunham (K. C. App.), 201 S. W. 640, 641; Stubenhaver v. Rys. Co. (K. C. App.), 213 S. W. 144; Johnson v. Ry. Co. (K. C. App.), 290 S. W. 462, 465. These are cases in which counsel were permitted to state to the jury that defendant could have the plaintiff examined as a matter of absolute right, and they are cited with approval in Atkinson v. Ry. Co., 286 Mo. 634, 228 S. W. 483. But, it does not appear that any such argument was made in this case. The accident occurred June 8, 1926. This action was commenced September 14, 1926. There was evidence that in the meanwhile defendant had been advised of plaintiff's claim. On October 21, 1927, defendant's physician, pursuant to consent given by plaintiff, had X-ray pictures taken, and testified at the trial that her kidneys were found to be in normal position. A physician who attended plaintiff for some time immediately following the accident and had X-ray pictures taken had testified that among other injuries he found "a sort of a traumatic misplacement of the kidney." The argument in question was directed to the timeliness and good faith of defendant's efforts to investigate the real nature and extent of plaintiff's alleged injuries, in view of defendant's long previous knowledge of the existence of her claim. Plaintiff's counsel did not assert that defendant could compel her to submit to a physical examination as a matter of right, and the cases cited are not in point. Hence, this assignment of error is overruled.

Counsel for appellant also say that the court erred in overruling defendants' motion to discharge the jury "after plaintiff had pretended to faint in the court room and was assisted from the room in the presence of the jury, and during the trial lay on a couch in the judge's chambers." As complained of in defendants' motion for a rehearing the incident was that "plaintiff fainted in the court room and it was necessary for two men and a lady to assist her from the court room." Neither at the time of its occurrence, nor in the motion for a rehearing, did defendant suggest that plaintiff was guilty of any pretense therein. Furthermore, the record shows that it was the observation of the trial judge that plaintiff did not even faint, but "stumbled and fell down, and they took her by the arm and assisted her out." In this state of the record we cannot say that the court abused its discretion in refusing to discharge the jury.

Appellant's remaining assignment of error is that the amount of the judgment is excessive. Plaintiff claimed that she was thrown against the back of the elevator, that a place on her back about the size of her hand was caused to be discolored, that she became very

nervous, that her menstrual periods became irregular, that she suffered severe pains in her back and lost about 15 pounds in weight. She returned to her place of employment and worked for a short while, but was afterward confined to her bed for a number of weeks. She experienced severe headaches, impairment of hearing, sleeplessness and extreme nervousness, accompanied by sweating and numbness of the hands and ankles, which rendered her unable to work and continued to the time of the trial. There was evidence of misplacement of the right kidney, injury to an ovary, and enlargement of the thryoid gland. There was evidence that prior to this accident she enjoyed normal health and vigor and suffered no such impairments. When her physician, Dr. Striegel, was asked to take into consideration the conditions he had found and state if, in his opinion, plaintiff was reasonably certain to continue to suffer with those ailments in the future, he answered: "The possibilities are that she is." He was further asked: "And would you say, having in mind the duration of those matters up until the present time, that those injuries are of a permanent character, in your opinion?" His answer was: "Yes, sir." Dr. Deppe, who treated plaintiff over a period of months, testified as to certain nervous disorders he found existing and said: "I can't say she is going to be this way all her life, and I can't say she won't, but she hasn't made any improvement since I have seen her. In fact, her condition on October 17th was worse than when I first saw her. . . . There should have been some improvement, yes, under treatment." Counsel for defendant interposed no objections to the form of the questions that elicited this testimony regarding the permanency of plaintiff's injuries, and, as above noted, appellant's criticism of the single instruction given at plaintiff's request is that it authorized a recovery for double damages for the same injury, and not that it erroneously submitted the question of the permanency of plaintiff's injuries. The burden of defendant's insistence now is that under the evidence their permanency was doubtful and the extent of plaintiff's injuries was insufficient to warrant the amount of the judgment rendered. We do not think the amount is excessive, and the judgment is affirmed. *Gantt, Frank* and *Henwood, JJ.,* concur; *Ragland, J.,* dissents in separate opinion in which *White* and *Ellison, JJ.,* concur.

RAGLAND, J. (dissenting).—The only question of substance raised on this appeal is whether the damages awarded by the jury are excessive. Whether they are or not depends chiefly upon whether there was any *substantial* evidence tending to show that there was a reasonable certainty that respondent's condition at the time of the trial, resulting from the fall of the elevator in which she was a pas-

senger, was permanent. If the condition is permanent the damages assessed are inadequate; if not, they are excessive.

I. The epitome of the evidence relating to the nature and extent of respondent's injuries contained in the principal opinion does not, in my opinion, accurately reflect the record. When the elevator was brought back to the main floor following its drop, plaintiff walked out into the lobby and waited an interval before going to the street to take a car. She was very nervous. Presently she walked out into the street unassisted and entered a street car. It was necessary for her to change cars enroute home; this she did without assistance, and after leaving the car walked a half block to her home. She then went to bed; she was suffering from acute pains in her head, back, ankles and feet; the calves of her legs were numb. Shortly after supper she called the family physician, Dr. Striegel. He found her in a highly nervous condition, and prescribed a sedative. She went to work the next day as usual and continued to work for a period of about three weeks thereafter, though suffering from extreme nervousness all the while.

On the evening of the second day following her injury Dr. Striegel made an examination of respondent's back. He found a discolored place about the size of the palm of the hand over the right lumbar region, but no other evidence of external injury. According to his diagnosis: "there was injury to the lumbar region; to her back and kidneys . . .,—a sprain or an injury to the muscles and ligaments."

At the end of approximately three weeks following the first visit to respondent, there having been no improvement as to her nervous condition and menstrual irregularities having developed, Dr. Striegel sent her to an X-ray specialist, Dr. Belton. The latter reported to Dr. Striegel by phone and letter that "the (right) kidney was out of place; had slipped down." Thereupon Dr. Striegel further diagnosed the injury as "a sort of a traumatic misplacement of the kidney." He also gave it as his opinion that the menstrual disturbances came from weakness of the ovaries, "due to shock and the nervous condition."

Following the taking of the X-ray Dr. Striegel bound the lower part of his patient's back with adhesive tape and put her to bed, where she remained for a period of six weeks. As respondent's ailment, manifesting itself in headaches, dizziness and nervousness, did not yield to Dr. Striegel's treatment, he recommended that she consult a neurologist.

At the trial (approximately a year and a half after the casualty giving rise to this controversy) plaintiff testified:

"I am suffering with terrible hearaches, and I have to go to bed, and the only relief I have is to take aspirin, and the pains come down the back of my neck; and terrible nervousness; suffer constantly with nervousness. There are no amusements at all I care for any more. The crowd annoys me. . . . The crowd gets on my nerves and I feel just like tearing them up. I want to get away from them. . . . I have no relief whatever from my back since that time, and pains in my back and over the hip and down the right side. . . . They are more severe (when I menstruate). At times I am very dizzy. I can't do anything but lie down. If I get up I fall over, and I am cold and numb."

Plaintiff further testified that prior to her experience in the falling elevator she had suffered none of the conditions just described, but had been in all respects normal.

On the 22nd day of October, 1927, Dr. Gray Briggs, an X-ray specialist, at Dr. Striegel's request, took an X-ray picture of respondent's kidneys, one of the right kidney and one of the left. The films were introduced in evidence. They showed both kidneys were in their normal position. Dr. Briggs testified, however, that a kidney displaced by trauma in the course of time often resumed its natural position.

On September 11, 1926, Dr. Arthur H. Deppe, who had been engaged in the practice of medicine for eighteen years and who for the greater part of that time had specialized in nervous and mental diseases, made a very thorough examination of respondent. Following that examination he saw her from time to time up until the trial of the case in January, 1928. Called as a witness by respondent, he testified:

"The results of my findings were that she appeared to be undernourished, which, of course, I had to determine on her history as to her former weight. At the time I examined her, her weight was one hundred, nineteen and a half pounds. There was a decided flushing about the face and neck and upper part of her chest. Her hands and feet were cyanotic; they were moist and cold as compared with the other parts of her body. In scratching along the skin with the finger nail, it raised a welt, which we called dermographia, or skin writing. Her pulse was found to be one hundred and twelve. It was noticed that the right lobe of her thyroid gland was slightly enlarged; that she had rather markedly dilated pupils. It was also noticed that her tendon reflexes were very active. They were equal. There was noticed, in testing the sensation, pathology; that she was unable to distinguish the point from the head of a pin and light touch over the entire right leg. The upper level of this disturbance of sensation extended to the groin. There was no evidence of paralysis. There was no evidence of any muscle atrophy. There

was a slight Romberg. That is, with her toes and heels together and her eyes closed there was a swaying of the body. My conclusions at that time were that she was suffering from a functional neurotis, the objective evidences of which were a rapid pulse, the flushing about the face and neck, tremor of the extended fingers and protruded tongue, the skin writing, or otherwise called dermographia, the cold, cyanotic hands and feet, and the Romberg. At this time I might add that she complained of some tenderness of the calf muscles on pressure. The disturbance to sensation found in the right leg, that is, her ability to distinguish the head from the point of a pin and light touch over the right leg, was not due to any pathology of the central nervous system, but was due to a functional neurosis. . . .

"Q. Now, what do you mean by functional neurosis? A. That is a neurosis in which the symptoms are subjective. They may refer to any part or any organ of the body, for which they are unable to find any evidence of pathology, but for which we have objective evidences in the imbalance of the sympathetic nervous system.

"Q. Subjective injuries are those that you can't see—that you take the patient's word for? A. Symptoms that the patient complains of.

"Q. And objective, are those that you can see? A. Yes.

"Q. Now, in the instant case, you couldn't see any objective symptoms of injury, could you? A. No.

"Q. You had to take the patient's word on the subjective part? A. Yes.

"Q. You have to depend entirely on the veracity of the patient, isn't that true? A. On her history.

"Q. What she tells you about it? A. Yes. . . .

"Q. If you assume, Doctor, that this girl, prior to the time of her injury, was a girl who was alert and cheerful, had no nervous manifestations, worked steadily, and then she had this accident and the attendant maladies after this accident, would you say that this accident, in your opinion, was the cause of those things or not? A. Yes; I would.

"Q. Assuming, Doctor, that those affects have continued to exist down to the present time, taking into consideration her appearance today, would you say that, in your opinion, she is reasonably certain to continue to suffer with them in the future? A. Well, that is speculative. You can't say anything about it. Some of those cases clear up and some of those cases go on and don't clear up. She showed very little improvement while under my observation, and I would think that under treatment that she should have shown some appearance that she is going to get well. Of course, something might happen later in life. She might show some improvement. I can't say she is going to be this way all her life, and I can't say she won't,

but she hasn't made any improvement since I have seen her. In fact, her condition on October 17th was worse than when I first saw her."

With respect to the permanency of respondent's injury Dr. Striegel testified as follows:

"Q. Doctor, I will ask you this: Having in mind the duration of those complaints, from June 8, 1926, up to the present time, the condition of the back, headaches, nervousness and menstrual disturbance, I will ask you if, in your opinion, she is reasonably certain to continue to suffer with those ailments in the future? A. The possibilities are that she is.

"Q. And would you say, having in mind the duration of those matters up until the present time, that those injuries are of a permanent character, in your opinion? A. Yes, sir."

The foregoing is a summary of all the evidence having any bearing on the question of whether respondent's condition as testified to by herself and her physicians is *reasonably certain* to be permanent. It discloses that at the time of the trial respondent was suffering from no discoverable objective physical injury; she was nervous, but the nervousness was purely functional; there had been no organic injury to the central nervous system. Not an organ or tissue exhibited the slightest abnormality. The slightly enlarged lobe of the thyroid gland was merely a symptom of nervousness, nervousness having caused the gland to become somewhat over-active—a temporary condition so far as could be determined at the time of Dr. Deppe's examination. Now, if respondent had been crippled or maimed or had sustained some visible or tangible physical injury, the jury might have been able to have formed some just conclusion as to the permanency of such injury without the aid of experts. But it is manifest that from the data afforded by the evidence no layman could draw therefrom a valid inference as to whether respondent's condition would be projected into the future for any definite length of time. Such an inference could be drawn only by one having the requisite experience capacity—an expert in that particular field. [See Scanlon v. Kansas City, 28 S. W. (2d) 84, 95; Greenleaf on Evidence (17 Ed.) 522, sec. 430a.]

Two witnesses, Dr. Striegel and Dr. Deppe, were called upon to give their opinions as experts as to whether respondent's condition was permanent. Dr. Deppe unquestionably had the requisite experience capacity to draw from the facts presented such deductions as they warranted. When asked whether plaintiff was reasonably certain to continue to suffer in the future the maladies which manifested themselves following the casualty, he said: "Well, that is speculative. You can't say anything about it. . . . I can't

1044

say that she is going to be this way all her life, and I can't say she won't."

Dr. Striegel when first asked as to the permanency of respondent's injuries said it was *a possibility*. Counsel then put the answer into his mouth in this fashion: "And you say, having in mind the duration of those matters up until the present time, that those injuries are of a permanent character, in your opinion?" and he assented with a "yes, sir." This "yes, sir" in response to the question so carefully framed by counsel is the only bit of evidence in the case that plaintiff's injuries are of a permanent character. Can it be considered substantial evidence?

At the time he examined and treated respondent Dr. Striegel had been engaged in the general practice of medicine between eight and ten years. It does not appear that he had ever given any especial attention to mental and nervous diseases or that he had ever before had a patient who exhibited symptoms in any respect like those manifested by respondent. Indeed, he confessed his inability to diagnose her ailment or treat her for it by recommending that she consult a neurologist. It is very generally held that a general practitioner of medicine is at least prima-facie competent to give an opinion in a case such as this. [State v. Liolios, 285 Mo. 1, 15.] And his opinion when given is of course evidence. Its weight and value as evidence, however, depend upon his knowledge, experience and impartiality—matters that ordinarily rest with the jury. But certainly it is competent for the court to determine as a matter of law whether an opinion in a given case has any probative value. [See Keller v. Supply Co., 229 S. W. 173, 175.] The opinion in question here is not in harmony with the opinion previously expressed by the same witness in answer to a similar question, it does not have the support of any other evidence in the record, on the contrary it is in direct conflict with it. When those things and the manner in which the opinion was elicited are all considered it cannot be regarded as having any substantial weight or value as evidence.

If the conclusion reached in the preceding paragraph is sound, it follows that there is no substantial evidence that respondent's injuries are of a permanent character. The mere possibility that she will continue to suffer from them in the future is not sufficient to authorize the consideration of future consequences as an element of her damages. The law in this respect is well settled: Consequences which are contingent, speculative, or merely possible are not to be considered. To justify a recovery for apprehended future consequences, there must be such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury. To say of a thing it is permanent means that it *will continue* regardless of contingency or fortuitous circumstance.

[Wilbur v. Railway Co., 110 Mo. App. 1. c. 698, 85 S. W. 671; Smiley v. Railway Co., 160 Mo. 636, 61 S. W. 766; Pendenville v. Transit Co., 128 Mo. App. 1. c. 605, 107 S. W. 453; Steinmann v. Transit Co., 116 Mo. App. 1. c. 678, 94 S. W. 799; Lebrecht v. United Rys. Co., 237 S. W. 112, 114. See also Clark v. Railway, 23 S. W. (2d) 174.] If the ailments from which respondent was suffering at the time of the trial are to continue with her during the remainder of her life, the damages awarded will not compensate her. On that hypothesis an assessment of $25,000 or $30,000 would not be unreasonable. On the other hand, if her condition is temporary $15,000 is greatly excessive. Sufficient time has now elapsed for respondent's physicians to be able to say with some degree of certitude whether there has been, or will be, a substantial amelioration of the condition in which she was immediately following the casualty and as a result of it. In the interest of the due administration of justice the judgment should be reversed and the cause remanded for another trial.

II. The only instruction asked or given on behalf of plaintiff was one on the measure of damages. It was as follows:

"The court instructs the jury that if under the evidence and the other instructions of the court, you find in favor of the plaintiff, then in assessing her damages you will allow her such sum as you believe and find from the evidence will fairly and reasonably compensate her:

"1st. For such pain and suffering of body and mind, if any, plaintiff has suffered by reason and on account of her injuries, if any, suffered on the occasion in question.

"2nd. For such pain and suffering of body and mind, if any, plaintiff is reasonably certain to suffer in the future by reason and on account of her injuries, if any, suffered on the occasion in question.

"3rd. For such permanent injuries, if any, plaintiff will suffer by reason and on account of the injuries, if any, sustained on the occasion in question.

"4th. For such loss of earnings, if any, you may find from the evidence plaintiff has suffered by reason and on account of said injuries, if any, suffered on the occasion in question, not however, to exceed the sum of $20 per week for such loss of earnings, if any.

"5th. For such future loss of earnings, if any, you find from the evidence plaintiff is reasonably certain to lose in the future by reason and on account of said injuries, if any, suffered on the occasion in question."

Plaintiff's injuries were, and are, caused by an intangible thing which manifests itself only in "pain and suffering of body and mind." There was no evidence that she has any injuries which can either now, or in the future, manifest themselves otherwise than by

1046

pain and suffering and a diminution of earning power. It is clear therefore that the court directed the jury to compensate plaintiff for overlapping elements of damages. The instruction was erroneous, even if warranted by the evidence.

It has become a common practice in personal injury cases for the plaintiff to ask no instruction defining the issues in the case, but to secure one on the measure of damages only. The natural implication which it gives rise to in the minds of the jurors is that they are expected to return a verdict for the plaintiff on some undefined ground, the court deeming it necessary to advise them only as to the damages which might be awarded. And the instruction on the measure of damages frequently, as in this case, catalogues at length in overlapping clauses, and to the extent of the overlapping duplicates, every conceivable element. The practice is vicious. Only the reversal of judgments obtained by means of it will end it. Mild criticism will no longer suffice.

For the reasons foregoing I dissent from the principal opinion. *White* and *Ellison, JJ.*, concur.