Margaret **RODEFELD** (Plaintiff) Respondent,

v.

**ST. LOUIS PUBLIC SERVICE COMPANY,** a Corporation (Defendant) Appellant.

No. 44044.

Supreme Court of Missouri, Division No. 2.

Jan. 10, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied Feb. 14, 1955.

Lloyd E. Boas, St. Louis, for appellant.

Wilbur C. Schwartz and Harry M. James, St. Louis, Joseph Nessenfeld, St. Louis, of counsel, for respondent.

BROADDUS, Special Judge.

Plaintiff brought this action to recover damages for personal injuries sustained on the morning of January 21, 1952, when defendant's bus ran into and knocked down upon her a metal stop sign. She recovered a verdict and judgment in the sum of $14,-000, and defendant appealed.

Plaintiff was a pedestrian, standing on the southwest corner of West Florissant and Grand Avenues in St. Louis, intending to cross the street. Defendant's bus was eastbound on West Florissant, and at the time of the accident the operator was attempting to effect a left turn into Grand Avenue. The metal sign post was embedded in the concrete sidewalk, about two feet south of the south curb line of West Florissant and somewhat more than ten and one-half feet west of the west curb line of Grand Avenue. The force of the blow broke the sign off at the base and in the course of its descent plaintiff was violently struck on the head and knocked down, bleeding and unconscious, to the sidewalk.

She did not fully regain consciousness until four days thereafter.

Plaintiff's personal knowledge of what occurred was limited to hearing the roar of a bus and catching a glimpse of the sign as it came down toward her head. She remembered nothing which happened thereafter until she found herself in a hospital bed several days after the accident. The case was pleaded and submitted under the doctrine of *res ipsa loquitur*, based upon the unusual occurrence of the bus leaving the vehicular portion of the highway, coming upon the sidewalk and striking the metal standard.

The bus operator, about five minutes behind schedule, had stopped in the bus zone near the corner for the purpose of discharging and taking on passengers. The right side of the bus was about three or four inches from the curb, and the front of the bus was about nine feet west of the metal standard. The bus was estimated to be thirty or thirty-five feet in length, and the rear end extends a distance of about six feet from the rear wheels. About an hour or so before the occurrence there had been a sudden snowstorm, which left about one and a half inches of snow on the ground. The curb on West Florissant is about five inches high, except at a sewer, where the street dips slightly. At the deepest point of this dip the curb is ten or eleven inches high. The sewer depression is about four feet in length, and the front of the bus had been stopped about three feet west of the west end of the depression. The grade toward the east is down. The operator was thoroughly familiar with the physical conditions at the intersection, having driven on that route "thousands" of times.

After he had discharged and loaded passengers, the operator started the bus forward, taking his foot off the brake and letting the bus roll forward, turning the wheels slightly toward the left for the purpose of making a left turn. After the bus had gone a distance of 4 or 5 feet east, the right rear wheel of the bus slid sideways against the curb. Both the operator and a police officer standing in the bus felt the bus hit the curb. The operator continued to let the bus roll forward and to turn the wheels to the left. After the bus had gone an estimated bus length farther, or an estimated 5 seconds later, a passenger seated at the rear of the bus screamed that a woman was lying on the sidewalk. The operator then completed his left turn and stopped at the east curb of Grand Avenue. It appears that in the course of the operator's maneuvering after the wheel had struck the curb, the right rear end of the bus ran over the sidewalk, and then struck and knocked down the metal standard. The only visible damage to the bus was at its right rear corner about 3 feet from the ground level. The operator felt the bus scrape the sign and was reasonably certain that he had struck it. His speed at the time was about 3 miles an hour. After stopping, the operator and the police officer went across the street and found plaintiff lying on the sidewalk unconscious, with blood on her head. The officer also noted that the standard had been broken off at its base and was lying on the sidewalk between plaintiff and the curb. He caused plaintiff to be conveyed to the City Hospital, accompaning her to that institution. Later on we will set out the extent of plaintiff's injuries.

Defendant's first contention is that plaintiff did not make a submissible case. Its sole point on this issue is that plaintiff's evidence "conclusively" proved that the accident was caused by a sudden and unexpected skidding of the bus, from which fact alone no inference of negligence could have been drawn, and therefore plaintiff destroyed the *res ipsa* case she would otherwise have had.

█ The rule that "mere" skidding is not of itself negligence, nor of itself will permit an inference of negligence, applies only where the evidence proves that the skidding is the "sole factual cause" of the occurrence. Dodson v. Maddox, 359 Mo. 742, 223 S.W.2d 434; Story v. Peoples Motor Bus Co., 327 Mo. 719, 37 S.W.2d 898. In the instant case not only was skidding not the "sole factual cause," but it was not any cause whatever, in the legal sense, of plain-

tiff's injuries. A brief review of the evidence will make this conclusion perfectly apparent. Defendant's motorbus, proceeding eastwardly on West Florissant, came to a stop at the south curb near the intersection with Grand Avenue. According to the bus operator, the front end of the bus was then about 3 feet west of a concrete slab on the sidewalk over a sewer opening. He testified that the slab was about 4 feet in length. The evidence showed that the "stop" sign post in question was about 2 feet east of the slab, and that it was at least 10½ feet from that point to the curb line of Grand Avenue. It thus appears that the front of the bus was about 9 feet west of the "stop" sign post when the bus stopped to discharge and take on passengers. The right side of the bus was only about 3 or 4 inches from the curb. West of the sewer depression the curb was 5 inches in height, and at the sewer itself the curb was 10 or 11 inches high. The bus was one of the newest types, 30 to 35 feet in length. The bus then started forward to the east, the operator taking his foot off the brake, letting the bus roll because the grade was down, although he was aware that under the conditions existing there was a likelihood of skidding because of the down grade. It was his intention to make a left turn into Grand Avenue. When the bus was moved forward about 4 or 5 feet the rear wheel of the bus slid or skidded sideways against the curb. The operator continued to drive the bus forward and to turn the front slightly to the left, at about 3 miles an hour.

It is evident from the foregoing facts that the bus did not skid into the sign post, and that the skidding or sliding against the curb was not the factual cause of the accident. It is also evident that the operator contributed to the skidding. The evidence showed that the rear end of the bus, that is, the right rear corner (which was what struck the metal pole) is about 6 feet to the rear of the rear wheel. Hence when the bus was stopped, the rear end was either 39 or 44 feet west of the stop sign, depending upon the length of the bus. When the bus slid against the curb, after it had moved forward about 4 or 5 feet, the rear end was

then still about 35 to 40 feet west of the sign. The bus driver felt the bus strike the curb, but nevertheless continued to let the bus roll forward and to the left. He did not lose control of the bus. He could have stopped it or proceeded straight ahead instead of turning his vehicle in an endeavor to make a left turn. Certainly he should not have let the bus "roll," with his foot off the brake while attempting to swing the bus to the left. He should have known that unless the rear of the bus was sufficiently far away from the curb when he made the turn it would necessarily go beyond the curb line and strike whatever was in its path. He knew of the existence of the sign and knew of the attendant dangers. Yet he continued forward and to the left with his foot off the brake. To say that the accident was caused by skidding into the curb some 35 or more feet from the sign post, is to ignore the evidence and the only reasonable inference to be drawn therefrom.

█ An examination of the cases relied upon by defendant will disclose that in every case in which mere skidding has been held to preclude recovery the skidding was the sole cause of the casualty and the operator of the vehicle not only did absolutely nothing to contribute to the skidding, but did everything within his power to avert the consequences of such skidding. To the extent that skidding is involved in the instant case, it may be noted that there are numerous authorities in which recovery is permitted in spite of (and sometimes because of) skidding where the evidence is not limited to skidding alone as the "sole factual cause" of the occurrence. Among such cases are: Tabler v. Perry, 337 Mo. 154, 85 S.W.2d 471; Triplett v. Beeler, Mo.Sup., 268 S.W.2d 814; Story v. Peoples Motor Bus Co., supra; Dodson v. Maddox, supra, and Lindsey v. Williams, Mo.Sup., 260 S.W.2d 472. In each of those cases it was ruled that an inference of negligence based upon the actions and conduct of the driver was permissible, and that skidding was not the sole factual cause of the accident and hence did not preclude recovery. The same is true as to the instant case. The court

correctly denied defendant's motion for a directed verdict.

Defendant's second point is that Instruction No. 1 given on behalf of plaintiff was erroneous for the reason that (1) it authorized a recovery on the *res ipsa loquitur* doctrine when the petition charged specific negligence, and (2) the evidence conclusively showed that the cause of the occurrence producing plaintiff's injuries was the sudden skidding of defendant's bus and negligence cannot be inferred therefrom. The latter is answered by what we have said relative to defendant's Point 1.

■ The contention that the charge in the petition that defendant negligently caused, suffered, and permitted the bus to run upon the sidewalk and strike an iron pole is a charge of specific negligence is without merit. The case of Harke v. Haase, 335 Mo. 1104, 75 S.W.2d 1001, is a complete answer to defendant's contention. So, too, is the holding in Tabler v. Perry, supra. In each of these cases, and in many similar ones, allegations of negligence such as pleaded in the instant case were held to be general, and proper for the application of the doctrine of *res ipsa loquitur*. The instruction was correct.

Under its third point defendant claims error in permitting plaintiff's witness, Dr. Connor, to give testimony of a history related to him by plaintiff, and to give his opinions and conclusions based upon the history and on opinions and conclusions of other doctors who had treated or examined plaintiff.

■ The only history related by plaintiff to Dr. Connor was that she told him that she was injured a year previous and had been taken to the hospital for treatment of a skull fracture. Neither of these facts related by plaintiff were in controversy. Defendant's witness, Dr. Scott, conceded the skull fracture. As said by this court in the case of Oesterle v. Kroger Grocery & Baking Co., 346 Mo. 321, 141 S.W.2d 780, 782: If, however, the so-called 'history' is made up of facts which in themselves are competent evidence, and which are in

evidence, then any objection to the use of such 'history' must fall."

■ The second part of the assignment of error is equally without merit. The hypothetical question put to Dr. Connor, in addition to reciting that plaintiff had a fracture of the skull, also assumed that she had suffered a concussion of the brain. The latter, also, was not in dispute. Plaintiff remained unconscious for a period of four days following the blow to her head. The doctor's opinion was not based upon the conclusions of other doctors but upon undisputed *facts*.

Defendant next contends that the court erred in permitting plaintiff's witness, Dr. Mueller, to testify as to the history stated to him by plaintiff and to give his opinions based in part on such hearsay statements. This complaint springs from the following. The doctor had been relating the complaints of plaintiff with respect to her existing symptoms and physical condition. He stated that these complaints were generalized pains in plaintiff's head, sharp sticking-like pains which come and go over the region of the scar in her left frontal area, *difficulty with her memory*, and a sense of weakness. Defendant's counsel then interrupted the doctor with the objection that plaintiff's complaint of difficulty with her memory was a narration of a past condition and therefore violative of the hearsay rule. Plaintiff had previously testified as to difficulty with her memory.

■ That a plaintiff's difficulty with her memory may be related to a physician and testified to by him was specifically held proper in Amick v. Kansas City, Mo.App., 187 S.W. 582, 584. The court there held that the statements were of present symptoms and hence properly received. In any event, in view of plaintiff's previous testimony as to difficulty with her memory, defendant was not prejudiced. Lesch v. Terminal R.R. Ass'n of St. Louis, Mo.Sup., 258 S.W.2d 686, 691.

Defendant's fifth point is that Instruction No. 9, given at the request of plaintiff on the measure of damages was erroneous for

the reason (1) that it authorized a recovery for permanent injuries when there was no substantial evidence that plaintiff suffered any permanent injuries, and (2) that it authorized a double recovery.

■ As to defendant's first criticism we need only to refer to the testimony of Dr. Fries, an ear, nose and throat specialist, and a past president of the St. Louis Medical Society. He made several examinations of plaintiff (including various recognized tests), and concluded that she had received an injury to the brain and that this brain injury resulted in a loss of hearing in both ears. He specifically testified that the condition he found upon examination, including the brain injury and the loss of hearing due to trauma, was a permanent condition.

Nor do we think the instruction authorized a double recovery. Its first clause reads: "The Court instructs the jury that if you find in favor of the plaintiff * * * then in assessing her damages, if any, you should allow her such sum as you may find and believe from the evidence will fairly and reasonably compensate the plaintiff for the injuries, if any, sustained by her on the occasion in question; and in arriving at the amount, if any, of your verdict you may take into consideration and account:"— then follow three paragraphs indicating the elements of damages to be considered.

■ Like criticism has been made of similar instructions and denied by this court on a number of occasions. Thus in Coleman v. Rightmyer, Mo., 285 S.W. 403, 406, the instruction told the jury that the damages should be assessed at such sum as it believed will be fair compensation to plaintiff for various items set forth in each of seven paragraphs. In answer to defendant's contention that some of these paragraphs covered the same ground and hence authorized a double assessment of damages for the same injuries and loss, this court stated: "The dominant thought is that the damages to be assessed should be fair, not double compensation. It is inconceivable that the jury would understand that if they found the injuries suffered by plaintiff were permanent that they should assess double damages for the injuries when the instruction expressly authorized is fair compensation. While the form of the instruction is not commended, the jury would clearly understand that in awarding damages they were to consider whether the injuries were temporary or permanent, and simply award fair compensation. If counsel for appellant apprehended the jury might take the view now suggested, they should have asked an instruction clarifying this feature." To the same effect are Keehn v. D. R. F. Realty & Investment Co., 328 Mo. 1031, 43 S.W.2d 416; Van Campen v. St. Louis-San Francisco Ry. Co., 358 Mo. 655, 216 S.W.2d 443; and Wild v. Pitcairn, 347 Mo. 915, 149 S.W.2d 800, 805.

The last assignment is that the verdict is excessive. The evidence shows that plaintiff, 53 years of age, was struck a severe blow by a metal sign and knocked unconscious to the concrete sidewalk. Her head was cut open and her skull fractured. Still unconscious, she was taken to the City Hospital. While there a cut on her forehead was sewn up. This cut has left a large jagged scar. Later that day she was taken to the De Paul Hospital where she remained for 12 days. She remained unconscious for most of four days following the accident. Neurological examinations at both hospitals disclosed an inconstant, enlarged right pupil, a deviation of her tongue to the right, and a drooping of the left corner of her mouth. The testimony shows that these neurological signs evidence a brain injury. After leaving the hospital plaintiff was treated at home for a time by Dr. Spoeneman and continued under his care until about February of the following year. Beginning in March, 1953, and continuing to the date of the trial in June, 1953, plaintiff was treated by Dr. Connor. She was also examined on various occasions by Dr. Robert Mueller, an expert neurologist, and Dr. Armand Fries, an ear, nose and throat specialist. Continually since the accident plaintiff has had pains in her head, which she clearly differentiated from an ordinary headache. She has also suffered with dizziness and unsteadiness on

her feet. She has been nervous and unable to do any more than the very simplest of household tasks. She has experienced difficulty in hearing and her memory has become bad. Prior to the accident her condition of health and hearing were good, and she was alert. The neurological examination by Dr. Mueller disclosed 3 positive neurological signs, namely, a facial weakness on the right side of plaintiff's face, a reduced reflex in her right biceps and a swaying in the Romberg position. It was his opinion that plaintiff had suffered a brain injury as a result of the trauma suffered at the time of the accident. The evidence shows that a brain which is damaged is never repaired by nature. Dr. Fries made a number of recognized tests on the basis of which he determined that plaintiff had sustained injury to her brain and hearing apparatus. His examination disclosed a loss of hearing in both ears, that in the right ear being 29.76% and that in the left ear 20%. It was the opinion of Dr. Fries that the loss of hearing was directly due to the injury sustained on the occasion in question and that the condition he found was one which will remain with plaintiff for the rest of her life. The constant pains and dizziness will be with plaintiff for a long time according to Dr. Spoeneman, and for quite some time according to Dr. Connor. It was Dr. Connor's opinion that plaintiff had adhesions of the brain as a result of the severe injury to her head.

There is no exact formula for gauging whether a verdict is excessive. Each case must be considered upon its particular facts. Consideration is given to the nature and extent of the injuries and disabilities, diminished earning capacity, changing economic factors and the compensation awarded and approved in cases of similar or fairly comparable injuries. The nature, extent and permanency of the injuries are the paramount factors and the ultimate test of excessiveness or of the inadequacy of award is what will fairly and reasonably compensate the plaintiff for her injuries. Brown v. Payne, Mo.Sup., 264 S.W.2d 341. In determining the question

we will review the evidence from the standpoint most favorable to plaintiff. When considered in that light it is apparent that we would not be justified in interfering with the jury's award, which has had the approval of an able trial judge on motion for new trial.

The judgment is affirmed.

ELLISON, P. J., and LEEDY, J., concur.