Carola C. GORMAN, Executrix of Estate of
Eugene V. Gorman, Respondent,

v.

ST. LOUIS–SAN FRANCISCO RAILROAD
COMPANY, a/k/a Frisco R.R.,
a Corporation, Appellant.

No. 52806.

Supreme Court of Missouri,
Division No. 1.

April 8, 1968.

Rehearing Denied May 13, 1968.

Mogab & Hughes, Richard L. Hughes, St. Louis, for (plaintiff) respondent.

Robert C. Ely, St. Louis, for defendant-appellant.

SEILER, Judge.

Defendant appeals from an adverse judgment on a $25,000 jury verdict in an action for personal injuries, loss of earnings, and hospital and medical expenses. Plaintiff has since died and his executrix has been substituted as respondent.

The petition alleged plaintiff was an employee of the Railway Express Agency and worked handling freight at the Union Station in St. Louis; that as he was engaged in loading freight into the defendant's baggage car a defective steam hose on the front of the baggage car caused a steam spray or fog which enveloped the area about the door of the car which plaintiff was then loading, "blinding plaintiff and making it impossible for him to see, thereby causing him to lose his footing and fall as he attempted to descend from a freight truck from which he was loading". The answer was a general denial and a plea of contributory negligence.

The evidence was that for 48 years plaintiff had been an employee of Railway Express Agency. For the last 19 or 20 years he had been a foreman, loading and unloading trains in Union Station, St. Louis, Missouri. On Sunday morning, November 16, 1961, he was assigned by the general foreman to work with a carloader, James Kelly, to load mail baggage and express into a Frisco baggage car making up part of Frisco outbound train No. 807 on track 16. Plaintiff said he was to "put the freight into Mr. Kelly". Frisco 807 at the moment consisted of two cars on the north-south track—a chair car and a baggage car. The loading was to be done from a Railway Express wagon, standing on a double concrete platform alongside the east side of the baggage car, through a double door which was about 9 feet from the head or south end of the baggage car.

Because plaintiff, when he fell and injured himself, was in the act of disembarking from the express wagon, we must describe it in more detail. The wagon is of heavy construction, about 9 feet long, 3 feet wide, with a flat bed about 30 to 36 inches above the ground, mounted on four 18 inch wheels. One end of the bed is closed, the other open. Along each side (plaintiff was climbing down the side when he fell) are two vertical side walls, each making up about one-third of the side, formed by two heavy vertical uprights to which are attached six 1 by 4 wood slats, placed horizontally with spaces of 2 or 3 inches between the slats (plaintiff referred to these slats as "lath" or "lattice work"). Between these two six-slat side walls is a chain gate, occupying the middle third of the side of the wagon, consisting of six loosely hanging chains, spaced 6 or 8 inches apart, running from one vertical upright to the other.

Kelly, the carloader, worked inside the baggage car. Plaintiff was in the wagon putting in what belonged in the baggage car and leaving what did not on the wagon until Monday.

There are 8 inch steam pipes in Union Station with connecting pipelines to each

track, where the steam, used to heat the cars, is connected to a pipe running beneath each car. In our case, the steam was connected by the railroad at the north end of the chair car and ran through the pipes to the south end of the baggage car, where a steam valve controlled the amount of steam permitted to pass out of the pipes into the open air.

Plaintiff said that when he and Kelly arrived at track 16 they could see "a great volume of steam going in all directions" and "mostly coming from the south end" of the baggage car; that "* * * you could tell it was extremely something wrong * * *"; that normally there "* * * would have been no steam flying around, except what escaped from the steam hose on the head end of the express car"; that the volume of steam "* * * was ninety percent more than ever should have been". Plaintiff tried to remedy the situation by turning the valve off at the head of the baggage car but the valve "was stripped" and plaintiff could do nothing with it. Plaintiff tried unsuccessfully to find someone with authority to turn the steam off at the back end of the Union Station. He then went back to attempt to unload the wagon, "Sure, it was my duty". By this time Kelly was in the baggage car putting away freight plaintiff had already unloaded. Asked to describe the condition of the steam around the wagon where he was working plaintiff said, "The steam was all around on top of me just the way the wind was going, steam all over my head and sometimes in the truck, and sometimes it rolled around over on the other side. It was a twenty-three mile wind and it had us to where I couldn't do anything with it". Asked to state what the steam did to the exterior of the wagon plaintiff said, "* * * the packages naturally were all wet and everything on the truck was set [wet?] and a mess. It wasn't a heavy stream of water, just a vapor. The glasses, there was no use trying to keep the glasses on because the water run down the glasses". Plaintiff testified he worked about 10 or 15 minutes, "* * * as long as I had

clearance there I kept putting it in there to him". He then decided to climb down and "Went over the top, over the side of the wagon on the east side of the truck". Plaintiff said further, "I couldn't see nothing as I was going down. I told you I had my foot in the side of the frame, and I jerked it up and started down and the steam came down over me and I lost my hold and down I went * * * My left shoe slipped." When asked what it slipped on, plaintiff answered, "It slipped out between them lathe, that my toe was sticking into". Plaintiff said he did not "* * * have a chance to catch myself. After I got on the lathe there wasn't enough space left there between the lathe where my foot came out and the concrete to save myself or grab anything * * *." Plaintiff said his reason for seeing what he could do with the steam valve was because he knew the steam was going to give him "some problem there" in his work; that he knew it might cause him some trouble when he was getting on and off the wagon.

■ Defendant contends first that it is entitled to judgment in its favor as a matter of law because, it says, plaintiff was fully aware of the excessive steam and was guilty of contributory negligence in getting on the wagon in the first place. However, it cannot be said that all reasonable men would agree plaintiff failed to exercise ordinary care for his own safety in first trying to proceed with his job under the circumstances and then climbing down from the wagon when it became too wet and uncomfortable to continue. An argument can be made on either side of this proposition. It was for the jury to say whether the situation confronting plaintiff in getting on the wagon and later getting off was such that he could reasonably have supposed he could safely proceed.

■ Proceeding in its argument as to why it is entitled to judgment, defendant next says that the only liability on the part of defendant would be on the basis of superior knowledge on defendant's part of a

defective condition not known to plaintiff (citing cases involving claims by invitees against the owner or possessor of land), which was not the case here, it says, as plaintiff was fully aware of the defective steam valve and its danger. We do not agree with defendant's contention, because the true basis of liability here is ordinary negligence. In determining duty or basis of liability the inquiry is whether, under the circumstances, defendant, in the exercise of ordinary care in providing the baggage car, could reasonably foresee a risk of injury from the escaping steam to someone working on private premises in the immediate vicinity while loading the car. If so, then defendant was under a duty to exercise the requisite care to avoid the risk of injury, and the question moves on to whether there has been a breach, proximate cause, etc.[1] The injury before us did not occur on defendant's premises and defendant's duty did not depend on plaintiff's showing that defendant had superior knowledge of the defective condition. Plaintiff was injured when he was climbing down the side of the Railway Express freight wagon, which was standing on the concrete platform not belonging to or in the possession of defendant. The limitations imposed by the possessor-invitee cases cited by defendants do not apply.

■ The next point in defendant's argument is that there is no proximate causation between the steam and the fall. Again, we rule no, because the jury looking back could reasonably have found that the steam would make it difficult to see and that the various exterior surfaces of the wagon, including the slats on the sides, which someone climbing down would naturally use as

footholds in the descent, would be made wet and thus provide a less secure footing. Plaintiff testified he could not keep his glasses clear, that there was a cloud of steam and he could not see as he was trying to get down, that his toe slipped out from between "them lathe" and he did not have a chance to catch himself. The jury could have found there was a direct line of causation from defendant's negligence in operating the railroad car with the defective steam valve to the cause of plaintiff's fall—a large volume of steam and resulting condensation, causing temporary blindness and wetting the sides of the wagon plaintiff was working on.

We rule the court did not err in overruling defendant's motion for a directed verdict.

■ Defendant next contends that plaintiff's verdict directing instruction no. 2, which reads as follows:

"Your verdict must be for plaintiff if you believe:

First, defendant delivered its railroad car for loading and that said car had a faulty or defective steam valve and as a result was not reasonably safe for loading by plaintiff, and

Second, defendant knew or by using ordinary care could have known of this condition, and

Third, defendant failed to use ordinary care to remedy said condition, and

Fourth, as a direct result of such failure, plaintiff was injured, unless you believe plaintiff is not entitled to recover by reason of Instruction No. 4.",

---

1. "Negligence * * * is simply one kind of conduct * * *. The traditional formula for the elements necessary to such a cause of action may be stated briefly as follows:
1. A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
2. A failure on his part to conform to the standard required * * *
3. A reasonably close causal connection between the conduct and the resulting injury * * *
4. Actual loss or damage resulting to the interests of another * * *", Prosser, Law of Torts, 3rd Ed., p. 146.

is prejudiciously erroneous because it failed to include a finding plaintiff did not know and by exercise of ordinary care could not have known of the defective steam valve and that as a result the baggage car was not safe for loading, which finding is included in the possessor-invitee cases under MAI 22.03 and in the negligently furnishing dangerous instrumentality cases under MAI 26.01 and which defendant says must also be included here.

We do not agree. This was not part of plaintiff's case. The law is well established that it is a common carrier's duty to use ordinary care to deliver cars reasonably safe for the use of shippers and their employees while the cars are being loaded or unloaded, Settle v. Baldwin, 355 Mo. 336, 196 S.W.2d 299, 303. Defendant has not cited any authority which holds that plaintiff, as a part of his case against the railroad under facts such as we have here must first prove lack of knowledge of the defect as an element of his cause of action. In effect defendant is asking us to limit the railroad's responsibility for negligence, but we see no sound reason for doing so. Whether plaintiff knew as much about the defect as did defendant went to the issue of contributory negligence, which defendant submitted by instruction no. 4 on whether plaintiff failed to exercise ordinary care for his own safety when alighting from the express wagon.

We find no error in instruction no. 2. There is no specific instruction contained in Missouri Approved Instructions for the case before us, but the form of instruction no. 2 meets the MAI requirements for instructions which must be specially drafted for the particular case, rule 70.01(e).

 Finally, the defendant argues that *if* a new trial is ordered it should be on damages as well as liability. However, we do not believe a new trial should be ordered and while defendant does state that the verdict is excessive, it cites no authority and shows no basis for such conclusion in view of the evidence in the record. The special damages at the time of trial were approximately $17,000. There was evidence plaintiff's knee cap was fractured in his fall, that two cartilages had been removed, that the leg was now stiff, required a leg brace, and that the injuries were permanently disabling. Defendant claimed plaintiff's injuries were sustained in an entirely different accident, but there was conflicting evidence on this and the matter was for the jury, which resolved the issue in favor of plaintiff. Defendant has not shown any basis for disturbing the verdict.

The judgment is affirmed.

All concur.