Robert L. SAMPSON,
Plaintiff-Respondent,

v.

MISSOURI PACIFIC RAILROAD
COMPANY, a corporation,
Defendant-Appellant.

No. 59908.

Supreme Court of Missouri,
En Banc.

Jan. 3, 1978.

Appellant's Motion for Rehearing
Denied Feb. 8, 1978.

574

Robert D. Youle, Kansas City, for defendant-appellant.

F. Russell Millin, Kansas City, for plaintiff-respondent.

SEILER, Judge.

Respondent (hereinafter referred to as plaintiff) was injured when he fell some fourteen feet to the ground from the top deck of a tri-level auto carrier railroad car. He recovered judgment, entered upon a jury verdict, for $300,000 on the theory that appellant railroad (hereinafter referred to as defendant) was negligent in delivering a tri-level railroad car which did not have a foot railing along the outside edge of its top deck in the middle of the car for a space of about four feet and nine inches, which rendered it not reasonably safe for the performance of his loading duties as an employee of the consignee, and that he was not warned by defendant of the condition of the car.

The court of appeals, Kansas City district, on the railroad's appeal, reversed and remanded for a new trial on the basis of failure of proof that the railroad had notice of the manner which plaintiff used the foot rail and also for failure to use MAI 31.01 as the main instruction on liability. On plaintiff's application we ordered the case transferred here, it appearing that a question of general importance was involved with respect to the duty of a railroad to inspect and warn as to a claimed defective condition in an auto carrier railroad car delivered by the railroad to a consignee, where the condition complained of was part of the design of the auto carrier as manufactured by a third party, and also as to the correct instruction for such a case.[1] We affirm.

Plaintiff had worked for General Motors Corporation at its Leeds Chevrolet plant since April 1949. For four years prior to May 17, 1965, the date of his injury which gave rise to this action, he worked in the automobile loading shed where the railroad cars were loaded, as a hookup man, a ratchet man, a driver and yard attendant. His job was to inspect loaded automobiles. In the course of inspection plaintiff checked the rail car number to see if it matched his papers. He then went to the head of the rail car, got on it, and started at the first automobile, checked its tie downs front and back to see if they were tight; checked the inside to see that all lights were out, and the doors locked, taking the keys and accumulating them for deposit in a designated place in the last car. After climbing to the second level the inspection procedure was continued. There were five automobiles on each of the three levels of the rail car, and on each level, including the third level from which plaintiff fell, there was about 18 inches to 24 inches space between the edge of the rail car and the automobiles, depending upon whether they had been driven on straight. In this space plaintiff walked sideways facing the automobiles while inspecting.

The rail car in question was constructed with a low railing, about 6–7 inches high, consisting of sections of angle iron, mounted horizontally along the outside edge of the top deck, on short vertical iron supports. Judging from the photographs in evidence there are ten of these rail sections along each side of the top deck. There also is a stout hand cable strung along each side of the top deck about waist high, in the same vertical plane as the railing below it. Except where interrupted by the vertical stanchions which support the hand cable, the angle iron railing is continuous along each side of the deck except in the middle portion where, for a distance of about four feet nine inches, there is no rail. It was at this point that plaintiff fell off the edge of the top deck.

By a contract between defendant and General Motors Corporation defendant agreed to furnish and switch auto carrier railroad cars known as "trailer trains" into and out of GMC's Leeds plant. Defendant's agents performed the switching operations and inspected the rail cars in the loading shed for safety defects and to see that

---

1. Plaintiff usually referred to the rail as a foot rail. The defendant usually referred to it as a side rail or kick rail.

bridges were down and tie-down chains and ratchets were in place. Fifteen to twenty of these rail cars were being loaded by the General Motors workers at each shift. The rail car in question was inspected about 4:00 p. m. on May 17, inside the loading facility at the plant, as to tie-down chains, ratchets, walkways, safety cables, "etc.", and again about 7:30 p. m. after plaintiff's accident.

Plaintiff started to work at 4:30 p. m. He had inspected two cars on the third deck, and was on his third car. He looked under it to see if the chains were tightened down at its front, then walked to the back and checked the chains, then came back to lock the automobile. "I went to receive my keys out of the ignition and was closing the door when I stepped back and missed the foot railing and fell." Snapshots of the rail car taken shortly after the accident show that the automobile which plaintiff was inspecting was parked in the center section of the auto rack. It was a two-door coupe and the right hand door, the one plaintiff was closing, was directly opposite the area where there was no railing. He did not know before this time that the foot railing was missing, and had never worked on a car where the railing was missing in the center. He testified further as follows:

"Q. . . . What use do you put that foot rail to when you are working up there?

A. More of a safety catch, sir.

. . . . .

Q. Well, state whether or not the foot rail is used by you?

A. Yes, sir, it was more for safety to catch you in case you fell.

. . . . .

Q. State whether or not the foot rail enabled you to know where your feet were?

A. Yes, sir.

Q. . . . Now, after you stepped back and fell, do you remember . . . anything until you were in the hospital?

A. No, sir.

Q. . . . Did you receive any warning from anyone on May 17, 1965 that there was a missing guardrail on the third deck of this railroad car?

A. No, sir. I did not."

On cross-examination plaintiff testified that when he fell he remembered only grabbing for the hand cable and did not know whether he fell over or underneath the hand cable.

Fellow employees of plaintiff Sampson testified that the use of the rail was as a guide for the feet of employees who had to back out of each automobile upon completing their interior inspection; that in inspecting the automobiles the employee would be facing the vehicle, with his attention primarily on it. One testified that the foot rail was to everyone "the important thing, more important than . . . the [hand] railing with the rope through it, because they were more or less loose."

Defendant makes several contentions of error in the trial court disposition, which we summarize as follows: (1) failure to make a submissible case of negligence; (2) contributory negligence as a matter of law; (3) that MAI 31.01 was the required instruction for plaintiff and that the one used, instruction No. 3, failed to include essential elements and was not supported by the evidence; (4) that instruction No. 7, referring to payment of workmen's compensation benefits, injected a false issue, and (5) numerous errors as to exclusion and admission of evidence.

I.

■ Without any doubt, a railroad which delivers a train car to one whose employees must load it is liable to the employees for negligence if the car is in an unsafe condition.

■ "It is also unquestionably negligence . . . for a railroad, when it delivers a car to a consignee whose employees are to load it or unload it, to fail to exercise ordinary care to see that it is in such condition that such employees, if exercising ordinary care themselves, can enter it with reasonable safety for the purpose of loading or unloading it", *Markley v. Kansas City Southern Ry. Co.*, 338 Mo. 436, 90 S.W.2d

409, 411 (Mo.1936); *see Gorman v. St. Louis-San Francisco R.R. Co.,* 427 S.W.2d 390, 394 (Mo.1968); 65 Am.Jur.2d *Railroads* § 415 (1972); Annot., 99 A.L.R.2d 176 (1965); and either to make repairs or warn of an unsafe condition. *Ward v. Kurn,* 165 S.W.2d 290, 293 (Mo.App.1942). Cases in which railroads have been liable for their delivery of a defective freight car usually involved conditions of the railroad car which a reasonable inspection by the carrier furnishing it would have disclosed, such as holes in the floor, defective brakes, defective car doors, and the like. Here defendant, by its answers to interrogatories, admitted that there was no foot railing for a space of four feet nine inches long in the center of the car in question. It is clear this was the original manufactured condition of the tri-level car; there was nothing mangled, bent or dislodged about it. Nevertheless, under the facts before us, for reasons discussed below, defendant's duty was to warn plaintiff and his fellow employees of the absence of the center section of rail for whatever reason it was missing.

Defendant argues that it is being held responsible for a matter of original design over which it had no control; that the railroad car was not subject to a "bad-order" upon defendant's inspection of it earlier in the day as it was exactly in the condition in which it was built and designed; that defendant had no authority to alter the structure of some other carrier's rail car; that there was nothing out of the way or dangerous for it to notice in any event; that what plaintiff is asking would require defendant to "second guess" the designer of the equipment.

Defendant says, further, that evidence which was offered but excluded would have shown the low railing was not intended as a safety device or foot guide, but to provide leverage for the hookup and ratchet men to push against as they moved and worked under the automobiles; that the rail was not intended to be used as plaintiff said he used it, that there was no proof of any general custom to use as a foot guide, and hence the "initial requirement" of the rule

about liability for use of a manufactured article negligently made—that it be dangerous when used in the intended manner—is absent, citing *Cohagan v. Laclede Steel Co.,* 317 S.W.2d 452, 454 (Mo.1958).

Although defendant states in one of its briefs that product liability rules are not applicable to a railroad and that defendant is in no sense a dealer or vendor of the auto rack, the effect of defendant's arguments set forth above is that it seeks to transfer a theory of liability developed in product cases where lack of privity formerly was a defense, *see Orr v. Shell Oil Co.,* 352 Mo. 288, 177 S.W.2d 608, 612 (1943), to this case involving the duty of a railroad with respect to a car delivered to a consignee. However, long prior to the development of products liability cases and removal of the privity requirement therein, the law as that an employee of a consignee could maintain an action directly against the carrier for injuries resulting from a defective or unsafe car, no matter who owns or designed and built it. The railroad here is not in the position of a retailer who sells or furnishes an article manufactured by someone else to a purchaser who departs with it and is later injured because of defective manufacture.

The railroad and its employees were aware of the kind of work which the General Motors employees did in loading vehicles. The railroad knew the work involved inspection of the loaded vehicles, getting in and out of the cars, locking the doors, removing the keys, etc. The operation had been going on for several years. The General Motors men would not begin the loading operation until a railroad employee gave the signal the cars were ready, which was after the cars had been inspected and the tie-down chains and connecting bridges had been put in place by the railroad men. The railroad had men who were stationed full time in the loading shed to help in readying the auto racks for receiving the cars, trouble shoot, and if need be, to assist the loading. It was apparent that with five automobiles to a deck, the door of the third automobile would be opposite the area

where there was no rail. The railroad knew, too, that part of the work was done on the third deck, fourteen feet above the ground, with not over 18 to 24 inches space between the automobile and the edge of the deck, a situation which prompted the manufacturer to install a hand rail cable running waist high along the edge of the deck so the workers would have something to hold onto. The low rail in question was directly below the hand rail, about 6–7 inches above the floor of the deck, right at the deck edge. There was testimony the low rail was used as a safety catch—it enabled one to know where his feet were.

■ Reasonable men, in the position of the railroad, would foresee that men working in the 18–24 inches space would be bound to use the low rail as a guide or protective device as they edged themselves along the narrow walkway, often with their backs to the deck edge, facing the vehicles which they were inspecting, getting in and out of automobiles, as well as under them. The railing no doubt was used by men as a brace against which to push, while getting under and while tightening chains, but that does not detract from the other uses which were certain to be made of it, including using it as a foot guide. Therefore, even if it be accepted fact that the defendant railroad had no authority to modify or change the structure of the auto rack and that the

designer of the auto rack did not design the angle iron rail to be used as a foot guide or stop, the railroad nevertheless was under a duty to warn the employees of the consignee of the absence of the railing in the center of the edge of the top deck when it knew or should have known the workers would rely on the railing as a guide or stop for their feet. The railroad concedes it gave no warning and of course it was aware of the missing section because it inspected the car shortly before plaintiff started to work.

■ Defendant's contention that plaintiff offered no testimony that the auto rack was improperly or unsafely designed does not meet the theory on which plaintiff was proceeding. The basis of liability here is ordinary negligence. As we said in a somewhat similar case, *Gorman*, supra, at 393, "[i]n determining duty or basis of liability the inquiry is whether, under the circumstances, defendant, in the exercise of ordinary care in providing the . . . car, could reasonably foresee a risk of injury . . . .." The test of foreseeability here is whether "in the ordinary course of events, it would be natural and perhaps necessary" for plaintiff to use the foot rail to keep from falling off the car in the performance of his loading duties. *Brooks v. Illinois Terminal Railroad Co.*, 269 S.W.2d 136, 138 (Mo.App.1954).[2]

**2.** The case relied upon by the dissenting opinion, *Sykes v. St. Louis & S.F.R. Co.*, 178 Mo. 693, 77 S.W. 723, 728 (1903), dealt with a claim for personal injuries by an employee of the consignee against an intermediate carrier, not the carrier which ultimately delivered the car to the consignee. In the course of declaring the duty of an intermediate carrier (as to which the court held plaintiff made no case), the court declared the duty of the ultimate or delivering carrier, as quoted in the dissenting opinion. The court said the latter must "exercise ordinary care to see that the car is *in such a state of repair* that such servants [employees of the consignee] . . . can enter upon it with reasonable safety for the purpose of unloading it" (emphasis supplied).

The key phrase "in such state of repair" refers to a mode or condition or state of being, the manner of existing, or state of good order of the railroad car, *see* Webster's Third International Dictionary; The Oxford English Dictionary, and is not meant to refer to the act of

making a specific repair. In the case at bar, plaintiff's position is that the auto rack, with the guard rail missing in the middle section, was not in such condition that the employees, while exercising ordinary care for themselves, could work on it with reasonable safety for the purpose of loading automobiles on the third level. If such was the condition of the railroad car, then it was not "in such state of repair" as called for by *Sykes*, even if the origin was a matter of design. Therefore, a holding that plaintiff made a submissible case does not constitute an extension of the *Sykes* rule, if the fact is, as the jury could find plaintiff's evidence showed, that the missing rail kept the auto rack from being in the required state of repair when the defendant delivered it to General Motors. Disposing of the case by characterizing the defect as one of design does not meet the issue of whether defendant failed to warn that the car was not reasonably safe for purposes of plaintiff's loading duties.

Accordingly, we conclude that plaintiff made a submissible case.

## II.

Defendant asserts plaintiff was guilty of contributory negligence as a matter of law. While defendant marshals numerous facts, it concentrates on plaintiff's testimony that he stepped backwards out of the automobile without looking, although he admitted that had he looked behind him he could have seen that there was no foot rail there. This, defendant says, makes plaintiff's conduct comply with the description of contributory negligence in Restatement (Second) of Torts § 478 (1965), which states "When the negligent act of the plaintiff is necessary to make a dangerous situation negligently created by the defendant effective in harm, the plaintiff's negligence is always a contributory factor in producing his harm and as such prevents him from recovery against the negligent defendant." Hence, argues defendant, plaintiff cannot recover even if defendant were negligent (which it denies), because of plaintiff's negligence in stepping backwards as he did.

But this overlooks plaintiff's claim that he and the other workers were used to working on the top deck with a continuous foot rail along the outside edge of the auto rack which they used as a guide for their legs and feet and to keep them from slipping off the edge; further that he had never worked before on a car where part of the foot rail was missing and was not aware it was missing on this particular car. If the facts were as plaintiff asserted them to be, then his stepping backwards out of the vehicle from which he had just removed the car keys preparatory to closing the door and moving on to the next vehicle, expecting there to be a foot rail at the edge of the deck floor (something which he presumably had done many times before) would not be a case of his stepping backward when he should have known there was no foot rail and would not necessarily be negligent—it

would be a matter on which reasonable men could differ and hence it was properly a matter for the jury to resolve. A person is not required to look for danger where he has no cause to anticipate it or when the danger would not exist but for the negligence of another. *White v. Burkeybile*, 386 S.W.2d 418, 424 (Mo.1965). We are unable to conclude there was contributory negligence as a matter of law here and overrule defendant's contention on this issue.

## III.

Although defendant is emphatic that the situation before us is not one for application of product liability rules and that those rules do not apply to a railroad car supplied by a common carrier to a shipper, defendant insists here and has throughout the litigation that MAI 31.01 (formerly 26.01), which is generally thought of as a products liability case instruction, was the required instruction for plaintiff; that instruction No. 3 as given for plaintiff misstates the law and that the case on which the given instruction was modeled, *Gorman v. St. Louis-San Francisco Railroad Co., supra,* does not apply here.

Instruction No. 3 read as follows:

"Your verdict must be for plaintiff Robert L. Sampson if you believe:

First, defendant delivered a tri-level railroad car for loading with new automobiles and that said car did not have a foot railing in the center of the top deck thereof for a space of approximately four feet nine inches and as a result was not reasonably safe for the performance of plaintiff's loading duties, and

Second, defendant knew or by using ordinary care could have known of this condition, and

Third, defendant failed to use ordinary care to warn plaintiff of said condition, and

Fourth, as a direct result of such failure, plaintiff was injured, unless you be-

lieve plaintiff is not entitled to recover by reason of Instruction No. 4."

MAI 31.01, which defendant, as said, insists was the required instruction, offers several choices of phrasing to the user. Since defendant has not attempted to suggest the exact form the instruction should take in this case, we set forth MAI 31.01 as it appears with its various choices and directions, as follows:

"Your verdict must be for plaintiff if you believe:

First, defendant [manufactured] [designed] [sold] [furnished] [repaired] the (*here describe the article such as an automobile*), and

Second, the (*article*) had (*here describe defect such as a cracked left front wheel*) and was thereby dangerous to persons [using it in the manner and for the purpose intended] [in the vicinity of its probable use while it was being used in the manner and for the purpose intended], and

Third, defendant knew or by using ordinary care could have known of the dangerous condition, and

Fourth, the plaintiff did not know and by using ordinary care could not have known of the dangerous condition, and,

Fifth, defendant failed to warn (*describe person to whom the article was delivered*) of such dangerous condition, and

Sixth, defendant was thereby negligent, and

Seventh, while (*the article*) was being used in the manner and for the purpose intended, plaintiff was damaged as a direct result of such dangerous condition [unless you believe that plaintiff is not entitled to recover by reason of Instruction No. —— (here insert number of affirmative defense instruction)]."

■ For several reasons we do not agree that MAI 31.01 should have been used in this case. In the first place, MAI 31.01 (and its predecessor MAI 26.01) grew out of products liability cases where formerly privity was required between plaintiff and defendant. As earlier pointed out, plaintiff had no need here to seek a form of relief where privity is not required. No such obstacle ever existed in a suit for negligence against the railroad for failure to provide reasonably safe cars. As originally adopted by the court, MAI 26.01 was based on strict liability (according to the Committee Notes appearing in MAI (1964) at 214), but soon thereafter MAI 26.01 was modified and has continued in its modified form as present MAI 31.01. The Committee Note explains that the committee considered the change desirable and that the modified instruction "is simply based on negligence and is well supported by Missouri cases."

If MAI 31.01 were used in the present case, several important modifications in the railroad's liability would occur. Clause second, in its reference to persons "using in the manner and for the purpose intended" would tend to limit the use of the foot rail in question to the purpose for which the designer specifically had in mind—for use by the ratchet and tie-down men when working underneath the automobiles. This would ignore the evidence that the location of the rail was such that it was likely to be relied on as a foot rail or safety guide by all the workers, regardless of the narrow purpose the designer may have had in mind.

Clause fourth would require plaintiff to prove as a part of his case that he did not know and by using ordinary care could not have known of the dangerous condition, which would in practical effect direct a verdict in this case in defendant's favor, whereas in the usual negligence case, plaintiff's ability to know of the danger would be part of the contributory negligence defense and the burden would be on the defendant so to prove, not on the plaintiff so to disprove.

Finally, clause seventh is not appropriate. It speaks about the article being used in the manner and for the purpose intended. Plaintiff thought there was a foot rail at the location where he was working, but there was no foot rail there to be used, and of course, it was not "intended" that the section of the rail car with the missing guard rail be used to guide or stop the

employee's feet. That perspective, ordinarily sensible, has no application here.

In *Gorman, supra,* we approved the use of a not-in-MAI instruction, upon which instruction No. 3 here was based. *Gorman* was a case where the railroad failed to provide a reasonably safe baggage car into which a third party's employee was to load mail from a nearby freight wagon. We there rejected the contention that MAI 26.-01 (now 31.01) applied. We pointed out that to use it would in effect be "to limit the railroad's responsibility for negligence", *Id.* at 394. The same would be true here.

Defendant has failed to cite and our research has not discovered any case in which MAI 31.01 or its predecessor was held to apply or used in a situation in which a railroad supplied a rail car to a shipper for loading. For all these reasons we decline to hold MAI 31.01 was the appropriate instruction.

■ Defendant also argues that instruction No. 3 allowed the jury to award damages without an express finding of negligence. Although the jury was not required expressly to find negligence by the instruction, the first three paragraphs thereof set out appellant's duty and breach. The better practice may be to require an express finding of negligence, but when the jury found a duty and a breach thereof, it found negligence, regardless of whether a separate paragraph of the instruction stated the conclusion that the defendant was thereby negligent. "[T]here is no necessity of, or magic in, using . . . [a] term when the same concept is projected by the use of other appropriate language." *Bollman v. Kark Rendering Plant,* 418 S.W.2d 39, 49 (Mo.1967). We note, too, that in *Gorman, supra,* the not-in-MAI instruction there approved had no express finding of negligence.

We find no error in instruction No. 3 or its use.

## IV.

We next consider the objections to plaintiff's instruction No. 7 pertaining to workmen's compensation benefits. This requires a statement of what evidence was before the jury on this subject. Plaintiff's witness Huston handled workmen's compensation and pensions at the General Motors Leeds plant. He brought three files with him, plaintiff's exhibits 6, 7, and 8. He identified No. 6 as plaintiff's personnel file and No. 7 as the plant medical records on Sampson No. 8, he said, "contain a Form 2–A, a receipt for compensation from the Division of Workmen's Compensation on Mr. Sampson" and also a schedule of medical bills, nurses' statements and hospital bills paid by General Motors for Sampson. Huston did not mention any figures or amounts, either as to medical expense or compensation. Apparently exhibits 6, 7 and 8 (which contain a mass of papers, slips, cards and forms) were not passed to the jury.[3]

Later, plaintiff's exhibits 21 and 22 were admitted into evidence, but again apparently not passed to the jury. These exhibits were summaries of the medical expense paid by General Motors and by plaintiff. Plaintiff's counsel stated to the jury shortly before resting plaintiff's case, that the summaries had been admitted in evidence and that the total medical expense in 1965 at Menorah Hospital and for doctors, nurses, ambulances, "and so forth" during that year was $8,742.30, and that additional medical expenses from March 3, 1968 when plaintiff returned to Menorah Hospital until August 9, 1971 were $6,196.25, the two making a total of $14,938.55.

Therefore, the jury had before it in rather confused form the mention of a receipt for compensation (but nothing as to amount), that General Motors had paid part of the medical expense (but nothing clear-cut as to how much, although in colloquy with the court outside the hearing of the jury it was clear that larger amount was paid by General Motors, the smaller by plaintiff), that plaintiff had himself paid certain medical expenses (again nothing

---

3. In most instances in this trial, when an exhibit was passed to the jury, the record so stated.

No such statement appears with reference to exhibits 6, 7, or 8.

clearcut before the jury as to how much), and that the total medical expense was $14,938.55.

■ We ordinarily look with disfavor upon the introduction of evidence of payments under the workmen's compensation act in this kind of case because of the danger that a false or foreign issue will thereby be raised and distort the contention of the parties as pleaded. *Pritt v. Terminal R. R. Ass'n of St. Louis,* 251 S.W.2d 622, 623–25 (Mo.1952); *Womack v. Crescent Metal Products, Inc.,* 539 S.W.2d 481, 484 (Mo.App.1976). Such evidence has nothing to do with either liability or damages. There are, however, instances where for reasons of inadvertence or error, *Womack v. Crescent Metal Products, Inc., supra* at 485, or intervention, *State ex rel. Transit Casualty Co. v. Holt,* 411 S.W.2d 249 (Mo. App.1967), or by agreement or stipulation, or as here, plaintiff's practical inability otherwise to prove the amount of medical expense, evidence indicating the payment of workmen's compensation benefits is, in some manner, placed before the jury. When this occurs, the most likely reaction of a jury (which cannot reasonably be expected to appreciate the theoretical foundation of workmen's compensation) will be that receipt by plaintiff of workmen's compensation benefits mean that to that extent his loss or damage has already been covered. Thus it may be necessary to clarify the limited use to which this evidence is to be put by reading a clarifying withdrawal instruction to the jury. MAI 34.01 and 34.02 Committee's Comments (1969). Such a withdrawal instruction is a matter for the trial court's discretion, *Helming v. Adams,* 509 S.W.2d 159, 169 (Mo.App.1974), which discretion should be guided by the degree to which evidence has been introduced which might mislead the jury in their consideration of the case as it is pleaded, *DeMoulin v. Kissir,* 446 S.W.2d 162, 166 (Mo.App.1969).

Here, at plaintiff's request, the trial court read instruction No. 7 to the jury, an instruction not found in our Missouri Approved Jury Instructions.

Instruction No. 7 read:

"Under the law the fact that General Motors Corporation has paid plaintiff certain benefits and has also paid his medical expenses under the Missouri Workmen's Compensation law may not be considered by the jury as barring his recovery in this case or diminishing the amount of his damages, if any.

"Under the law, if plaintiff recovers damages in this case, he must first repay out of any recovery all sums paid to him by General Motors Corporation under the Missouri Workmen's Compensation law."

Defendant asserts the purpose of instruction No. 7 was to increase damages by obtaining a double consideration of any compensation benefits paid plaintiff so as to produce a "net" recovery of more than compensatory damages; further, that there is no evidence that General Motors paid "certain benefits" and the language of the instruction about repaying "all sums" paid plaintiff under workmen's compensation invited the jury to speculate and is a comment upon damages.

■ The instruction does not misstate law and the first paragraph effectively withdrew the false issue which the trial court evidently believed had entered the case as to compensation benefits. "[W]here the evidence is of a character that might easily lead to the raising of a false issue, the court ought to guard against such an issue by appropriate instructions." *Estes v. Desmoyers Shoe Co.,* 155 Mo. 577, 56 S.W. 316, 319 (1900). See *Womack, supra,* for similar treatment under MAI. Does, then, the second paragraph reintroduce the false issue which the first paragraph had correctly withdrawn?

■ We disapprove use of the second paragraph. It is dangerous and unnecessary and is not to be used in future cases, but we do not believe it warrants disturbing the judgment in this case. It does not contradict the admonition contained in first paragraph, nor does it direct the jury to act one way or another. The transcript does not contain the opening statements of counsel nor the argument to the jury, but lack

of any complaint in the briefs indicates there must not have been any effort to argue double consideration of benefits or a theory of net recovery to the jury. The defendant in other parts of the briefs contends that various items of damages were improperly admitted into evidence, but makes no contention here that the amount recovered is excessive for the injuries sustained and pecuniary loss suffered. If plaintiff's evidence on injuries and damages is believed, as evidently it was by the jury which returned a verdict of $300,000, in order for the second paragraph to be deemed prejudicial we must assume that the jury was materially misled by the $14,-938.55 in medical and hospital expense and the fleeting and isolated mention by one witness that the file contained "a receipt for compensation" on plaintiff and that this played a major part in their decision to award plaintiff $300,000. We are not so convinced and therefore overrule defendant's contention as to instruction No. 7.

## V.

Defendant alleges that the trial court committed numerous reversible errors in rulings on evidence. We address each contention of error *seriatim*.

## A.

Defendant alleges that its evidence of plaintiff's past coronary attacks and history of coronary problems was material and relevant on the issue of plaintiff's life and work expectancy and the proximate cause of his damages. It had sought to show that plaintiff had suffered from a serious coronary condition since 1972, some seven years following the accident. Upon plaintiff's objection of immateriality the trial court prevented defendant's cross-examination of plaintiff regarding his heart condition and coronary history. Similar objections were sustained regarding cross-examination of other witnesses upon the effect of said heart condition upon life expectancy and the offer into evidence of hospital records indicating repeated diagnosis and history from 1972 of arteriosclerotic heart disease.

The trial court justified these rulings against defendant by noting that it had sustained defendant's pre-trial objection to the amendment of plaintiff's petition to add a claim of injury to plaintiff's heart and vascular system.

"[T]he court has prevented the plaintiff from interjecting that issue [of the heart condition], and the Court is likewise preventing the defendant from interjecting that issue, since it is not an issue in litigation."

Defendant complains because over its objection, plaintiff was permitted to read to the jury from the mortality tables that plaintiff's life expectancy at age 53 was 20.74 years.

■ Our case law is well settled that "the probative value of the mortality tables may be weakened, and even, perhaps, in some cases, destroyed by evidence of ill-health or disease of the person whose life expectancy is in issue." *Dorsey v. Muilenburg,* 345 S.W.2d 134, 142 (Mo.1961); *Moore v. Ready Mixed Concrete Company,* 329 S.W.2d 14, 28 (Mo.banc 1959).

Plaintiff does not contest our rule but rather justifies the ruling of the trial court by noting that defendant never connected the offered evidence of plaintiff's heart condition with his life expectancy and thus failed to lay a proper foundation for the admission of the excluded evidence. Defendant does not deny that it so failed to lay such a foundation but insists, to quote the brief, that the same was unnecessary in that "the jury in its collective human experience and wisdom . . . could consider the effect of such conditions upon *life* expectancy and certainly upon *work* expectancy—which plaintiff completely fails to mention though highly material upon both *past* and *future* loss of earnings. Considering such matters is the jury's *function*, not an invitation to engage in mere speculation." Plaintiff's trial counsel responded to defendant's effort to introduce evidence of the heart condition to rebut plaintiff's claim of future wage loss by noting that Sampson "was declared totally disabled in 1968, and

was so terminated by General Motors based on that recommendation. Any heart attack after that wouldn't have any relevancy on wage loss because he couldn't work anyway."

■■■ Reaffirming our prior holdings in *Dorsey* and *Moore, supra,* we readily conclude that evidence of plaintiff's heart condition was material to his life expectancy upon which his future worth in earnings is based. Evidence of disease, illness or other debilitating factors does not meet the admissibility of life expectancy tables but only goes to their probative value, which may thereby be substantially weakened. The evidence of the heart condition was material.

■■■ The question remains, however, as to whether defendant laid a proper foundation for the admission of said evidence. Standing alone, evidence of plaintiff's heart condition was of little use to the jury. It was evidence which required the connection of an additional fact to substantiate its relevance, to wit: the relationship between heart conditions of the kind which was Sampson's and life expectancy. Defendant insists that this is a matter of common knowledge and understanding, not requiring the testimony of an expert. We conclude otherwise. The opinion testimony of expert witnesses "should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved." *Housman v. Fiddyment,* 421 S.W.2d 284, 289 (Mo.banc 1967), *quoting Benjamin v. Metropolitan St. Ry. Co.,* 133 Mo. 274, 34 S.W. 590, 593 (1896). While our common understanding may be that heart insufficiency is not a matter of good health, the calculus of disability and life expectancy into which factors of severity and physical condition must be incorporated is a matter which we believe to be of technical medical knowledge beyond the ken of the average juror. *Standard Life & Insurance Company v. Roberts,* 318 S.W.2d 757, 762–63 (Tex.Civ. App.1958).

■■■ Defendant was required to show in his offer of proof some connection to the issue of damages based upon the opinion of an expert. If, as here, "the evidential fact thus put forward has on its face *no apparent connection with the case, an accompanying statement of the connecting facts must be made* by counsel, and a *promise to introduce them* at a later time if they have not already been introduced. This much is indispensable as a safeguard against the indiscriminate use of irrelevant evidence and as a measure to enable the adversary to discover any objection that might be appropriate." 6 Wigmore, Evidence § 1871, at 667 (Chadbourn Rev. 1976). Though the connection may be the subject of implication rather than of direct formal words, *id.,* examination of the transcript and briefs reveals no understanding between counsel or the court as to the relevance of the evidence of plaintiff's heart disease. Defendant's reply brief denies its intention or the necessity for any connection as discussed. Though material, the lack of foundation for the proffered evidence made it irrelevant and its admission unwarranted. The trial court's judgment on this question was therefore correct, though for reasons it did not address. Decisions on the admission and exclusions of evidence which are correct will not be reversed because they are justified by the trial court for wrong or insufficient reasons. *Franklin v. Friedrich,* 470 S.W.2d 474, 476 (Mo.1971); *Eller v. Crowell,* 238 S.W.2d 310, 313 (Mo.1951).

### B.

Plaintiff Sampson admitted that he had drunk two beers at Nadine's Tavern across from the Leeds plant just prior to his arrival for work on the day of the accident. In an effort to rebut this testimony and to support its contention of contributory negligence, defendant offered the following evidence, the admission of which was denied by the trial court on the objection of plaintiff: (1) Exhibit D–9, a petition for divorce and court file thereon filed by one Dorothy E. Sampson on September 13, 1967 alleging "that defendant [Robert Sampson] uses intoxicating beverages to excess" and that he

"spends his evenings in taverns." Said petition resulted in a divorce granted December 4, 1967. (2) Exhibit D–10, a petition for divorce filed by one Mildred Imerine Sampson against plaintiff here on February 7, 1961, alleging that Sampson "is habitually addicted to the use of alcoholic beverages and has been so for a period of more than one whole year." Said petition resulted in a divorce granted March 16, 1961. (3) Exhibit D–11, Sampson's health records at Independence Sanatorium from June 28 to July 15, 1972 showing final diagnosis of "ethanol withdrawal syndrome. Delirium tremens" and a history of "heavy intake of alcohol." (4) Exhibit D–12, Sampson's hospital records from Veterans Administration Hospital from August 2 to 23, 1972, containing final diagnosis of "chronic alcoholism." (5) Exhibit D–13, Sampson's emergency admission record at Menorah Hospital containing admission notes of "alcohol smell breath and confused and uncooperative, restless" and "evidence of alcohol" and an entry order by Dr. Galbreath, the physician who first attended plaintiff, for a blood alcohol test, the results of which, if any were actually made, were never placed in the file.

 The evidence of the divorces and the allegations of the petitions therein were inadmissible to attack plaintiff's credibility or to discredit plaintiff's testimony regarding the extent of his alcoholic intake just prior to the accident. These were collateral facts and unproved allegations which had no relevance to plaintiff's credibility as to the amount he drank just prior to his accident. *Huffman v. Terminal R. R. Assn.,* 281 S.W.2d 863, 871 (Mo.1955); *Bush v. Kansas City Public Service Co.,* 350 Mo. 876, 169 S.W.2d 331, 333 (1943).

 The hospital records regarding treatment for alcoholism in 1972, seven years following the accident, are too remote to be relevant or material to the issues for which they were introduced. Factual material having no probative value at all is irrelevant. S. Gard, Jones on Evidence § 4:1 (6th ed. 1972).

 Evidence of plaintiff's condition following the accident was presented to the jury. Defendant was permitted to read to the jury from exhibit P–7, Sampson's Leeds plant medical file, the entry of May 17, 1965 at 5:30 p. m. indicating "alcohol breath" and from the Menorah Hospital records indicating the same. Dr. Galbreath testified about smelling alcohol. Thus any error in excluding parts of exhibit D–13 dealing with the observation of plaintiff's condition was harmless, the same evidence being found in the testimony of other witnesses given before the objection was sustained. *Boland v. Jando,* 395 S.W.2d 206, 207–08 (Mo.1965); *Boring v. Kansas City Life Ins. Co.,* 274 S.W.2d 233, 239 (Mo.1955). As to the excluded entry made by Dr. Galbreath of an order for a blood alcohol test, no showing was made as to what threshold of "alcohol smell breath" would have to be crossed before he would order such a test. The ordering of a test would carry an unfavorable connotation which should not be permitted without the necessary foundation. Defendant never showed in its offer of proof or voir dire of Dr. Galbreath what difference there was, if any, between the fact that Dr. Galbreath ordered the test and his observation of "alcohol smell breath." The latter was the subject of testimony before the jury; the former was either cumulative or unclear and misleading without the connection. This is particularly true when it is not even known if such a test were actually performed. Dr. Galbreath testified he apparently was not concerned enough about the matter to pursue it to conclusion. The exclusion of this evidence was therefore not error.

C.

Dr. Frank E. Wagner testified as an expert witness of plaintiff. He testified that he was chairman of the Department of Economics of the University of Missouri at Kansas City and that one of his fields is statistics and labor economics. Dr. Wagner studied the earnings of men in plaintiff's classification; he assumed an age of 53 (plaintiff's age at time of trial) and a future work expectancy of 12½ years, based upon

a 1968 Department of Labor table, and a 1965 wage rate of $2.84. He testified to past wage loss for plaintiff of $65,761 and future wage loss at $246,445, or a present worth of $168,619 based upon a discount rate of 5%. Wagner acknowledged on cross-examination that he "trended" his calculation of past wage loss based upon 2,080 yearly work hours and past incremental wage increases. He assumed future wage increases of 7.3%, a figure based upon past increases in plaintiff's wages and productivity gains in the automotive industry.

Defendant complains that Dr. Wagner based his projections of work expectancy upon tables showing averages for all white males in all occupations, not industrial workers with coronary history and chronic alcoholism. While it may be valid that such data would affect life and work expectancy, we have already addressed the fact that defendant failed to show any connection in its offer of proof on either the heart condition or the alcoholism which would make its introduction probative. Dr. Wagner, a labor economist, was not the expert who was qualified to opine on the effect of disease upon work expectancy. Such witnesses as he can only be expected to take into account that evidence which has been introduced at trial, including that for which a proper foundation must be laid. *Oesterle v. Kroger Grocery & Baking Co.,* 346 Mo. 321, 141 S.W.2d 780, 782 (1940). Defendant having failed so to do with respect to evidence of plaintiff's heart condition and chronic alcoholism, the assumption of the expert witness is not subject to the challenge now made.

Defendant further challenges Wagner's calculations as being based upon pure conjecture and speculation—namely, that the "trending" of wages from 1968–74 and the use of an annual wage growth rate of 7.3% was opinion evidence not based upon a valid factual basis. *Butcher v. Main,* 426 S.W.2d 356, 359 (Mo.1968); *Meier v. Moreland,* 406 S.W.2d 97, 101 (Mo.1966).

Dr. Wagner made his calculations based upon Sampson's prior employment history. He assumed an annual hourly work rate of 2,080 hours, which is 52 weeks × 40 hours, having included a paid vacation and the effects of overtime (Sampson had worked one year as much as 2,538 hours) and downtime (strikes and twice annual delays in model changeovers which frequently result in temporary layoffs) which cancelled each other out. His figure of $65,761 for past wage loss did not include the period in 1965 before the accident nor the periods of 1966–68 during which Sampson had returned to work prior to his termination as "retiree-disability." This figure represents an annual average wage of approximately $10,000, which comports with the fact that from 1967 (Sampson's last full year at work) to 1974 (the year of trial) the hourly wage rate for Sampson's job classification rose from $3.21 to $5.12.

In assessing future wage loss, Dr. Wagner used a U.S. Department of Labor table to project a work expectancy for a white male of 53 years at 12½ years or to age 65½. He then maintained his estimate of 2,080 hours per year based upon Sampson's prior history (he averaged 2,151 hours worked per year from 1961–67) and projected a wage growth rate of 7.3% based upon the history of increased productivity in the automotive industry which, Dr. Wagner testified, was reported in the yearbook of labor statistics and is not related to inflation, though inflation may be its consequence. Based on these projections, Dr. Wagner arrived at a future wage loss for Sampson of $246,445, which represents an annual average wage over his 12½ years work expectancy of about $20,000. Under this projection Sampson would be earning a yearly income in 1978 of $16,750. Defendant calls Dr. Wagner's calculations "incredible and wholly speculative . . . without foundation and unbelievable." We do not agree.

The ultimate test for damages is whether the award will fairly and reasonably compensate the plaintiff for his injuries. *Rodefeld v. St. Louis Public Service Co.,* 275 S.W.2d 256, 262 (Mo.1955); *Rickard v. Pratt,* 459 S.W.2d 13, 17 (Mo.App.1970). The trending of past wage loss as calculated

by Dr. Wagner, when closely based upon plaintiff's prior employment history, is not so unreasonable or unfair as to constitute a mere guess or conjecture, *Summers v. Tavern Rock Sand Co.,* 315 S.W.2d 201, 206 (Mo.1958), or not to be reasonably certain, so as to eliminate mere speculation. *McDonald v. Missouri-Kansas-Texas Railroad Co.,* 401 S.W.2d 465, 470–71 (Mo.1966). "[T]he 'extent of future harm to the earning capacity of the injured person is measured by the difference viewed as of the time of trial between the value of the plaintiff's services as they will be in view of the harm and as they would have been had there been no harm.'" *Coffman v. St. Louis-San Francisco Ry. Co.,* 378 S.W.2d 583, 595 (Mo.1964). A figure for loss of future wages "is not to be permitted when formed from speculation and conjecture, but only when established with reasonable certainty", *Hodges v. Johnson,* 417 S.W.2d 685, 689 (Mo.App.1967) upon which "substantial evidence" must be introduced. *Seymour v. House,* 305 S.W.2d 1, 7 (Mo. 1957).

We have given weight in the evaluation of damage awards to changing economic conditions, *Braun v. Roux Distributing Co. Inc.,* 312 S.W.2d 758, 768–69 (Mo.1958); *Rodefeld v. St. Louis Public Service Co., supra* at 262, including consideration for "continuing inflation", *Finn v. Farmer,* 289 S.W.2d 144, 150 (Mo.App.1956). In *Coffman, supra,* we approved the use of reasonably expected salary increases "from which to determine a fairly approximated present-value award compensating plaintiff for what he would have earned, but for his injury." *Id.* at 600.

 Dr. Wagner admitted under cross-examination that projected wage increases "may not take place." He also insisted that increased productivity of the automotive industry is not inflationary and that said productivity, and not inflation, was the measure of the 7.3% wage increase projection.[4] Inevitably there is a degree of speculative nature to the determination of a "fairly

approximated present-value award compensating plaintiff for what he would have earned, but for his injury", but we do not find such speculation, when based upon the use of facts in reasonable calculations, to be so purely conjectural as to improperly influence the jury's verdict as to damages. This testimony was not a mere forecast of the effects of inflation, *see Haley v. Byers Transportation Co.,* 414 S.W.2d 777, 782 (Mo.1967), but a prediction based upon reasonable certainty, *Hodges, supra,* and the best available evidence, *Hargis v. Sample,* 306 S.W.2d 564, 569 (Mo.1957). The trial court did not err in admitting Dr. Wagner's testimony.

### D.

 Defendant offered considerable evidence, excluded by the trial court upon plaintiff's objection, which concerned the design, ownership, and inspection of the railroad car from which plaintiff fell and the extended use of this and identically designed cars in the GMC Leeds plant where the accident occurred. The evidence as to design, ownership, and inspection was offered to show that (1) the car was delivered as designed without physical defect, (2) defendant had no authority or opportunity to alter or reconstruct the original design, and (3) defendant inspected this car consistent with the requirements of the American Association of Railroads. This evidence was properly excluded. As discussed *supra,* the ownership and design of the car from which plaintiff fell was completely irrelevant to the issue of defendant's negligent failure to inspect and warn, which issue was the essence of this suit for damages. The testimony that the inspection of the car comported with the operating rules of railroad interchange procedures and with the requirements of the American Association of Railroads was also properly excluded as irrelevant in respect of the duty of defendant to inspect the car for its safety when used by plaintiff in the performance of his

---

4. We note with interest the observation of Nobel economist Dr. Milton Friedman that the current underlying structural rate of inflation

in the United States is 7 to 9 percent. St. Louis Globe-Democrat, December 7, 1977, at 4G, col. 3.

loading duties. That was defendant's duty; evidence that the inspection satisfied requirements otherwise applicable was material to the question of defendant's inspection, but not probative of the proposition at which it was directed, and was thus irrelevant.

Defendant also offered the following evidence which was excluded by the trial court upon motion of the plaintiff: the testimony of one James Black, an engineer employed by Whitehead and Kales Company, and exhibits D–16 to D–19, inclusive, showing that his company designed and built the rack of the car from which plaintiff fell for Northern Pacific Railroad Company, predecessor of Burlington Northern (third party defendant and owner of the car), being a model produced for two years and of which 620 were made, including four ordered by this defendant for the Leeds plant pool, and that many racks of other models had identical structures of racks and that two other cars with identical racks were in the loading area at Leeds on the date of the accident.

█ This evidence was offered to impeach plaintiff's credibility and to rebut his testimony that he had never before seen a car structurally like this one. This was both material and relevant to the issue of plaintiff's contributory negligence. The jury was required to assess the credibility of plaintiff's contention that he had never seen a car like this. In passing on the question presented by the excluded evidence we must first consider what other evidence to the same effect was before the jury.

Witness Francis Polski, foreman of the Leeds shed at the time of the accident testified that rail cars for the Leeds plant were in "pool service" and that all such cars, including the one in question, were frequently in and out of the plant. Witness Homer Petty, a fellow GMC employee of plaintiff, testified in response to the question "Had you ever seen a car like this before . . . ?" with "Yes, I have, and I have seen them since, too." Petty also testified that to his knowledge, no railroad car had ever been rejected by GMC because of this foot rail. Witness Oscar Garlington, another fellow employee of plaintiff, testified that he had seen cars like the one from which plaintiff fell with the same type of foot rail thereon in the Leeds loading shed.

Sampson himself testified that in his own four years working in the shed he had "seen hundreds of these auto racks in and out", that he was aware they were in "pool service", meaning they went back into the shed not long after they went out, that the same cars were in and out of the plant. He admitted that were he looking on the third deck he could have seen that there was no section of rail at the center section.

█ There was evidence before the jury, therefore, from which it could conclude that in all probability plaintiff had seen and worked on other auto carriers with the same missing rail condition. Yet the jury did not so conclude, which was within its purview. The excluded evidence does not add anything to the probabilities already in the case. Plaintiff had admitted he had seen hundreds of auto racks in and out. There was no showing that the 620 auto racks of this model were used primarily in the Leeds plant operation rather than elsewhere in the United States at other automobile assembly plants. Only four were specifically ordered for service at Leeds. None of the excluded testimony is necessarily inconsistent with plaintiff's testimony or demonstrates that it was a fabrication more strongly than which was already admitted. Cumulative evidence is additional evidence of the same kind bearing upon the same point. *State v. Harris,* 334 Mo. 38, 64 S.W.2d 256, 258 (1933); 29 Am.Jur.2d *Evidence* § 4 (1967). In our opinion the excluded evidence was no more than cumulative and its exclusion does not warrant a new trial. *Creager v. Chilson,* 453 S.W.2d 941, 944 (Mo.1970).

The judgment is affirmed.

MORGAN, C. J., and BARDGETT and RENDLEN, JJ., concur.

HENLEY, J., concurs in dissenting opinion of DONNELLY, J., and dissents in separate opinion filed.

FINCH, J., dissents in separate opinion filed.

DONNELLY, J., dissents in separate opinion filed.

HENLEY, Judge, dissenting.

I concur in the separate dissenting opinion of Donnelly, J. I also dissent for the following additional reason:

A railroad company furnishing a railroad car to a consignee for loading goods to be shipped over its railroad owes a duty to use ordinary care to either (1) provide a car the condition of which is reasonably safe for use by the consignee's employees in the process of loading it, or, (2) to warn the employees of risks of unsafe conditions it should realize they may not discover by the exercise of ordinary care. *Markley v. Kansas City Southern Ry. Co.*, 338 Mo. 436, 90 S.W.2d 409, 411[2, 3] (Mo.1936); 65 Am. Jur.2d, Railroads, § 415, p. 583; Restatement of the Law, Agency 2d, § 492, p. 436, and § 525, p. 498. This is essentially the same duty an employer owes his employee to furnish a safe place to work. *Markley v. Kansas City Southern Ry. Co., supra,* at 411–412[4].

The evidence is that the alleged unsafe condition was readily discoverable if plaintiff exercised due care for his own safety. Plaintiff testified as follows in response to cross-examination: "Q. * * * Mr. Sampson, if you had looked when you were checking the automobiles on the second deck level could you have seen that there was not a side rail at that location in the center of the car? A. If I had been looking, yes, I could have seen that it wasn't there, sir. Q. And if you had been looking on the third deck could you similarly have seen that there was no section of rail at the center section? A. If I had been looking I could have seen it, sir."

I would hold that plaintiff was guilty of contributory negligence as a matter of law.

FINCH, Judge, dissenting:

I respectfully dissent. I would reverse and remand for new trial.

In my opinion the giving of Instruction No. 7 constituted reversible error. I can conceive of no excuse for or justification of the second paragraph of that instruction and the principal opinion offers none. In fact, it disapproves of it, says it is dangerous and is not to be used in future cases. It concludes that it was not reversible error but I cannot concur in that conclusion.

The jury had been informed that plaintiff had been paid compensation by General Motors although they were not given figures as to how much. They heard plaintiff's witness Huston identify a file as containing a receipt for compensation on Sampson plus a schedule of medical bills, nurses statements and hospital bills paid by General Motors for plaintiff. Later plaintiff's counsel told the jury that the medical expenses amounted to $14,938.55. With that background the court gave Instruction No. 7 to the jury. It strains credulity to assume that the jury would consider that it was simply a meaningless explanation to them which was not to affect their actions and which they should ignore. Instructions are exactly what they are called, instructions to guide the jury in its actions.

What then, would have been its effect? Actually, there is no way to know. The admonition in the first paragraph of the instruction was that workmen's compensation benefits *and* medical expenses paid by General Motors were not to be considered as barring recovery or diminishing damages, if any. However, the plain effect of the second paragraph is to inform the jury that the plaintiff is not going to be able to keep all the money they might award him. The jury might reason therefrom that they could and should add to the sum they wanted plaintiff to have an additional amount to cover his obligations to General Motors. But how much? The instruction was a roving commission, not specific in this regard. The jury might have decided that this would be the $14,938.55 of medical bills *plus* some unknown amount of workmen's compensation payments. The first paragraph clearly tells the jury that the plaintiff received something besides his medical ex-

penses but not how much or what they were for. In view of plaintiff's serious injuries, they could have concluded that the compensation paid included damages for pain and suffering, lost wages, etc., and was considerable.

If that potential addition was clearly limited to the medical bills, it would be possible to say that remittitur of the amount of those bills would cure any prejudice. But such isn't the case. There simply is no way to know whether or if the jury added a sum to make plaintiff whole after reimbursement or, if it did, how much. We only know that the court at plaintiff's instance gave an erroneous, uncalled for instruction that had the potential of misleading the jury as to what they should or could do in assessing damages. Under such circumstances remittitur is not a viable alternative.

Since I would reverse and remand for retrial, I make the further observation that on retrial plaintiff's verdict directing instruction should be redrafted. In my view Instruction No. 3, in not requiring the jury to specifically find that the conduct submitted constituted negligence, did not conform to the general pattern employed in MAI.

A format which requires a finding that defendant was negligent is used repeatedly in MAI. For example, see 17.02, 20.01, 20.02, 21.01, 22.01 and 24.01. Any of these could have been adapted to fit this plaintiff's case. Instead, plaintiff obviously gave an instruction patterned after the instruction utilized by plaintiff in *Gorman v. St. Louis-San Francisco Railroad,* 427 S.W.2d 390, 393 (Mo.1968). The difficulty with relying on that decision as authority for a failure to require a finding of negligence is that the instruction in *Gorman* was not attacked on that basis and that issue was not considered or decided. I recognize that some of the instructions in the 22.00 series of MAI use a different format but I would require that plaintiff's instruction conform to the general pattern which MAI utilizes.

DONNELLY, Judge, dissenting.

In *Sykes v. St. Louis & S. F. R. Co.,* 178 Mo. 693, 712, 713, 77 S.W. 723, 728 (1903), Division No. 1 of this Court said:

" . . The liability of a railroad to the servants of shippers or consignees for injuries received by reason of defective appliances does not, therefore, rest upon the convention, agreement, or contract of the parties, nor upon the mutual interest or profit of the parties, but such liability is gauged and regulated by the general principles of law applicable to negligence. In other words, a railroad is liable to any one for injuries that are inflicted by its negligence. It owes a duty to mankind to so conduct its own business as not to be guilty of negligence that results in injury to third persons who are themselves without fault, and who are injured while in the pursuit of their lawful business. This is the basis, the reason, and the extent of its liability. Under this rule, when a railroad loads cars with freight to be delivered to a consignee whose servants are to unload the car, it is charged with the duty to exercise ordinary care to see that the car is in such a state of repair that such servants, while exercising ordinary care themselves, can enter upon it with reasonable safety for the purpose of unloading it."

I am unable to discern any compelling reason, and the principal opinion gives none, for extending the *Sykes* rule to impose liability on an ultimate carrier for failure to warn of a defect in the *design* of a railroad car manufactured by a third party.

I respectfully dissent.